matter was one wherein a judge was reported under Cobb's state ethical requirement to report *prima facie* conduct which might be prejudicial to the administration of justice. The report occurred within then in ongoing litigation in the Massachusetts courts. Now, soon after, in early 1996, and some five years before the intentionally delayed indictment came down, Cobb had sought admission to the U.S. Supreme Court. He then had every qualification, and was building a growing practice. This was a practice founded on Cobb's core legitimate, political beliefs that all tortfeasors who he agreed to prosecute in the courts were to be treated on an equal footing, not as a function of their potentially high position in either society or government or both.

By this time, Cobb had already: raised federal civil rights claims against the Governor and Lieutenant Governor which, although not ultimately successful, were certainly non-frivolous and are reported; successfully prosecuted one of the most prominent law firms in New England under civil RICO; sustained under Rule 12 via reported opinion what may still be the shortest known Hobbs Act RICO pattern in these United States, sustained cases under Rule 12 pursuant to both Title IX and Title VII for same sex sexual harassment, the last such opinion emanating from this very session, and he had otherwise served unequivocal notice in the courts and in the media that he would take the hard cases that nobody wanted as against those with money and power if the law so required. He by all accounts was  - and still is - according to the BBO, a member in good standing with the

Page 21 of 77

Massachusetts Bar.

Yet, when he then personally went to the Clerk's Office of the SJC to obtain the required Certificate in Good Standing to submit to the U.S. Supreme Court, he was summarily Denied the Certificate, notwithstanding the fact that he was in good standing. Upon further inquiry, Cobb learned several days later, again in person and from the Clerk, that the Certificate would not issue for so long as the BBO "matter" was pending. Cobb went ahead though and submitted the application the Supreme Court. Some time later, most likely a week or so, Cobb spoke to the Clerk of the Supreme Court, who said that he had made inquiry and was told by the SJC that it would not issue the Certificate because of the pending mater(s) before the BBO (one involving the report of the judge, the other, a baseless, non-speech related claim soon dismissed). Now, in view of the fact that Cobb at all times was a member in good standing, he was deserved of the certificate, and the summary denial of the same is an inference of a bias exhibited towards him, even then, by the SJC.

But the worst of the specific bias, indeed, a rank appearance of unfairness, from the SJC towards Cobb of late was its appointment of one of the state's key witnesses (a "victim" of Cobb, no less) at the BBO to the BBO itself WHILE COBB'S PROCEEDINGS WERE STILL ONGOING AND BEFORE THE BBO PASSED JUDGMENT ON THE MATTER.

It is neigh impossible to say what a far reaching signal such an appointment would be to the gentleman's (Mr. Rose) colleagues on the Board. He is given the Official State high

court stamp of ethical approval, meaning his track record is devoid of ethical misconduct. Yet part of the issued addressed in the Cobb matter impinged greatly upon his and his law partner's undisputed unethical conduct which the then trial judge freely allowed and encouraged. The Board could therefore rest assured, as it did when recommending disbarment, that everything said by Cobb about Rose, his partner, Blute, and the judge must be folly, since ITS ADMITTED SUPERVISOR, THE SJC, had said beyond purview that this man, and implicitly his then law firm and partners, has always been beyond ethical reproach.

This also certainly infers that the here subject then trial judge did nothing wrong ethically. It was now certified without bothering with taking evidence as to this point at the very BBO hearing she had then avoided attending that was no ethical violation then ongoing before her, and, therefore, Cobb's reasonable inference of bias was not.

The undersigned has seen some quite skillful ploys in litigation in his all too brief tenure in the law in this fine City, but this one deserves top Honors because it is truly in a class by itself. Should the SJC and Rose have waited until **after** these proceeding were concluded to make and accept this appointment? Yes, that is if either of them actually cared about the appearance of impropriety or the rank prejudice that this could have as against Cobb. An accused pedophile in Massachusetts is treated with more dignity than an accused lawyer who finds himself trapped in a ten year emotionally agonizing boxcar trip to disbarment before the BBO on retaliatorily motivated charges,

let alone one who sounded the whistle at the starting gate.

**Younger Abstention Exceptions (bad faith)** - these are the same as the substantive claims set forth below.

**Collateral Estoppel and Res Judicata in specific regards to claims of deprivation of First Amendment Rights.**

We have held that "in cases raising First Amendment issues . . . an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 499 (1984).

Cobb did not get a fair chance in the state system at the BBO to create such a record to show that his speech was **prima facie** truth based (although the record certainly contains prima facie truth on this point), either because of the BBO's specific ruling that the Judge need not testify as above, or because of the allowance of the other judge in question to testify on matters which the BBO specifically used to block the first such judge's testimony when it was in Cobb's favor.

If raised as a defense, these matters will be more fully elaborated upon in due course.

**Substantive Due Process**

**Overview** - The reckless allegation of "theft" for which disbarment is admittedly solely based upon was fabricated from the outset, and this fabrication was manifestly exposed and at least partially admitted to by the state at the so called BBO "hearing". The state continued to move forward on another Liberty

Page 24 of 77

wrecking charge of "theft", however post exposure and admission as above of its first "theft" fabrication. This was done post closure of evidence, and without indictment therefore, by simply then re-casting orally during closing argument no less another "theft" theory which was diametrically opposed to and otherwise legally and factually irreconcilable with its discarded indicted theory no less. The re-cast theory was and remains unsupported by even a scintilla of competent evidence.

DISBARMENT by the state shakes, indeed uproots, the very foundation of one's life long Liberty interest in his reputation. It's destroyed by this label, plain and simple, and effectively forever. The term itself is perhaps the most reputation destroying and employment preventing label short of "World War II Nazi Party Official" or "convicted repeat pedophile sexual predator" known to mankind outside the prison walls, and maybe even within. When one hears of a disbarred attorney, who ever really inquires as to what for? It's presumed he most likely stole money from his clients, and lots of it. It's presumed that whatever he claims post branding as to his innocence will be seriously discounted by society. Most telling, it's presumed that he was fairly judged, and that is the nucleus of the problem in this case. It is truly the essence of one's Liberty to not be so unfairly savaged in his reputation by the state. And this is simply because there is no interest more important to a man than his reputation.

Although the words "substantive due process" are not therein found, a good starting place for this discussion is <u>Schware v.</u>

Page 25 of 77

Board of Bar Examiners of New Mexico, 353 U.S. 232, 238-9 (1957). There, the court held:

> A State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment. n5 Dent v. West Virginia, 129 U.S. 114. Cf. Slochower v. Board of Education, 350 U.S. 551; Wieman v. Updegraff, 344 U.S. 183. And see Ex parte Secombe, 19 How. 9, 13. A State can require high standards of qualification, such as good moral character or proficiency in its law, before it admits an applicant to the bar, but any qualification must have a rational connection with the applicant's fitness or capacity to practice law. Douglas v. Noble, 261 U.S. 165; Cummings v. Missouri, 4 Wall. 277, 319-320. Cf. Nebbia v. New York, 291 U.S. 502. Obviously an applicant could not be excluded merely because he was a Republican or a Negro or a member of a particular church. Even in applying permissible standards, officers of a State cannot exclude an applicant when there is no basis for their finding that he fails to meet these standards, or when their action is **invidiously discriminatory**. Cf. Yick Wo v. Hopkins, 118 U.S. 356. (bolding added).

The bolded portion above really relates to the state attempting to disbar without any basis, plain and simple. Schware had nothing to do with procedural due process.

The First Circuit has adopted a tough but fair standard necessary to successfully raise a substantive due process claim. In Amsden v. Moran, 904 F.2d 748, 753-54 (1st.Cir.1990), Judge Selya held that:

> [A] substantive due process claim implicates the essence of state action rather than its modalities; such a claim rests not on perceived procedural deficiencies but on the idea that the government's conduct, regardless of procedural swaddling, was in itself impermissible. Stating the proposition does not cabin it very well. It has been said, for instance, that substantive due process protects individuals against state actions which are

Page 26 of 77

"arbitrary and capricious," Newman, 884 F.2d at 25, n5 or those which run counter to "the concept of ordered liberty," Palko v. Connecticut, 302 U.S. 319, 325, 82 L. Ed. 288, 58 S. Ct. 149 (1937), or those which, in context, appear "shocking or violative of universal standards of decency," Furtado v. Bishop, 604 F.2d 80, 95 (1st Cir. 1979) (footnote omitted), cert. denied, 444 U.S. 1035, 62 L. Ed. 2d 672, 100 S. Ct. 710 (1980). See Rochin v. California, 342 U.S. 165, 172, 96 L. Ed. 183, 72 S. Ct. 205 (1952)(in substantive terms, Due Process Clause condemns conduct "too close to the rack and the screw"); cf. Tenoco Oil Co. v. Department of Consumer Affairs, 876 F.2d 1013, 1020-24 (1st Cir. 1989) (discussing disfavored status of substantive due process claims).

We decline the invitation to sort out so wide a variety of labels. Wordplay aside, we agree with Judge Friendly that, in the circumscribed precincts patrolled by substantive due process, it is only when some basic and fundamental principle has been transgressed that "the constitutional line has been crossed." Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.), cert. denied, 414 U.S. 1033, 94 S. Ct. 462, 38 L. Ed. 2d 324 (1973). As distinguished from its procedural cousin, then, a substantive due process inquiry focuses on "what" the government has done, as opposed to "how and when" the government did it. And although the yardstick against which substantive due process violations are measured has been characterized in various ways, we are satisfied that, before a constitutional infringement occurs, state action must in and of itself be egregiously unacceptable, outrageous, or conscience-shocking.

So the purely legal question here is, does the state's reputationally savaging disbarment of a lawyer for theft, when the state knows or reasonably should know if it bothered to look that no such evidence exists (i.e., no simple "humdrum legal error" here, as Judge Selya put it in <u>Amsden</u>, supra, at FN 5), particularly when the state conducts the disbarment process in a system whose sole contribution to injustice is to add but one more nail to the coffin of arbitrary conduct for safe keeping, constitute a deprivation of Liberty under the above standard? Of course it does. Given the legal theory as above, what might we

ask is the sum total of the so called "evidence" supporting the state's claim of theft by the notorious hardened criminal mastermind Matt Cobb? If this sum total is zero, then Cobb wins this claim. If the state presented anything COMPETENTLY evidencing even a prima facie theft, then the state wins this substantive due process claim. In analyzing below this state "evidence", we are really looking at issues of competency (is this evidence at all?) or relevance (does this information bear upon a charge that Cobb stole something?). So, here is the state's evidence of theft.

**ONE**

Accordingly, we affirm the judgment dismissing the complaint and the orders of the motion judge and single justice assessing sanctions against plaintiffs' counsel [Cobb] We also consider this appeal frivolous and award double costs against the plaintiff's counsel.

Exhibit 1.

**TWO**

The wholly incompetent AMOL testimony of the same man, Blute, that the said Judge allowed and encouraged to commit undisputed ethical misconduct before her on the record before rewarding him with sanctions against Cobb for suing his partner, and only after she accepted an out of session case any disclosure to Cobb and his clients, that he "believed" without stating any basis therefore when asked that Cobb was personally responsible for a certain sanction handed down by the Single Justice of the Mass. Appeals Court, even after he could not point to a single document nor word supporting the same, and, lastly,

**THREE**

A statement by Cobb's ex-client that Cobb "offered to split" court sanctions with them which per the above were supposedly put solely on Cobb.

That's it! Let's take them seriatim.

Number **ONE** above -

First of all, whatever this language is, we can be certain as to what it is not. It is simply not an "order" of any sort. Not in fact, not in sprit, not implicitly, not in specificity, not in directive, and not in accordance with constitutional principals even if it were. It does not order anything whatsoever of or from anybody whatsoever, not of Cobb, not of the Pope, anybody. The state's entire basis of "theft" rests wholly on the above statement not only being an "order" for Cobb to do something which he supposedly disobeyed, but also that the above statement somehow "modified" without saying so **a real order** of the trial court (Smith, J.), Exhibit 2, which ordered, not Cobb, but, quote "Cobb's clients" to pay the subject sanction. It is uncontested that this was done, and the obligation for the Client to pay arose long before this misnomer of a quote from the Appeals Court came down. The issue of who was to pay these sanctions was never an issue, either in fact nor even on the Appeal. An Appeals Court cannot and does not "Affirm" something which never occurred

Secondly, even if the above passage were an "order" of any sort, which it was not, then it would have to be clear since its violation would be cause for contempt. So, cases explaining the

specificity requirements of "orders" and the state's ability to punish clear violations thereof are instructive. One of these cases is Judge Woodlock's recent Opinion in Hoult v. Hoult, 2003 U.S. Dist. LEXIS 5017, at p. 16-17, wherein he points out that:

> In order to find [so and so] in civil contempt, there must be a showing that there was an unequivocal order that was "clear and unambiguous." Goya Foods, Inc., 290 F.3d at 76. See also Gemco v. Seiko, 61 F.3d 94, 98 (1st Cir. 1995). "The test is whether the putative contemnor is "able to ascertain from the four corners of the order precisely what acts are forbidden." Goya Foods, Inc., 290 F.3d at 76., quoting Gilday v. Dubois, 124 F.3d 277, 282 (1st Cir. 1997); See Project B.A.S.I.C. v. Kemp, 947 F.2d 11, 16 (1st Cir. 1991); Cadle Company v. Schlictmann, Conway, Crowley & Hugo, 939 F. Supp. 90 (D. Mass. 1996)(O'Toole, J.). See also NBA Properties, Inc. v. Gold, 895 F.2d 30, 32 (1st Cir. 1990). Where there is any ambiguity as to the terms or requirements of the order, the terms are construed to the benefit of [so and so], as the persons charged with contempt. See Gilday v. Dubois, 124 F.3d at 286; Project B.A.S.I.C. v. Kemp, 947 F.2d at 17. "This requirement of clarity derives from concepts of fairness and due process." Project B.A.S.I.C. v. Kemp, 947 F.2d at 17. Here, [the party claiming that the order was violated] bears the burden of proving, by clear and convincing evidence, that [so and so's] actions were contumacious in violation of a court order. Goya Foods, Inc., 290 F.3d at 77; Project B.A.S.I.C. v. Kemp, 947 F.2d at 16; Cadle Company, 939 F. Supp. at 91.

So as to ONE above, Cobb followed the order of Judge Smith, Exhibit 2, directing that his client pay. The Appeals court neither "reversed" this order nor "modified" it. The state has yet to explain how a court can modify or reverse without saying so, or can order something to be done without saying so.

No. **TWO** above -

**Mr. Blute's testimony**. Let's say that Matt Cobb and the BBO

actually get along. Cobb "believes" that Blute committed bank fraud. He goes to the U.S. Attorney with this "evidence", and is there asked to state his basis for this belief, but he has none, it's just his belief. Could a U.S. Attorney then scheme with Cobb to prosecute Blute for bank fraud on this "evidence"? Why not?

We have a member of the bar that the BBO can vouch for stating that "I believe, therefore it is so", isn't that enough to deprive one of his Liberty? What more do we need? While I am at it, I might as well finger some other folks based on my beliefs. This certainly is an efficient form of justice, since it dispenses with all that costly and time consuming stuff we call "evidence". In reality, both Blute and the state have had a symbiotic relationship all the way back to Blute's unethical *ex parte* cherry picking of the trial Court Judge as above out of session years ago to summarily ditch Cobb's client's case and sanction Cobb. This cozy relationship continued at the BBO, where Blute then ostensibly provides the sole "evidence" that Cobb was somehow responsible for a payment which a Judge ordered his client to make. Amazing.

No. **THREE** above

A statement by Cobb's ex-client that Cobb "offered to split" court sanctions with him. Truly this statement is irrelevant. It was also coached, but that is another matter (see prosecutorial misconduct section herein).

Now, years before the OBC / BBO got involved, Cobb and his client Nutile had closed out the case. By any measure it had been

a resounding success. Nutile settled for $45,000.00 tax free for a one time incident of alleged, uncorroborated sexual harassment in a doctor's office. During the case in Suffolk Superior Court, Cobb was sanctioned $4,000.00 personally by the trial Judge (Sosman) because he had sued Nutter, McClennen & Fish and one of its partners, Rose, because they had directly threatened Cobb's client with a lawsuit they knew was baseless even though she was represented by Cobb at the time. Years later, it turns out that Cobb's arguments as to the theory of recovery against the unethical wrongdoers was 100% valid. See Magistrate Collings Ruling in <u>Metzler v. Grant</u>. After Judge Sosman ruled, in August 1994, Cobb took an appeal to a "single Justice" of the Mass. Appeals Court.

Judge Lawrence, while agreeing with Cobb that Rose had acted unethically in communicating with Cobb's client, nonetheless awarded, under Mass.R.A.P. 25 NMF a sanction roughly in the amount of $3,700.00 because Cobb had argued in the Appeal papers that Judge Sosman was biased, as evidenced by the undisputed fact that she willfully allowed NMF and Blute to practice before her in violation of several ethical rules, and that such deed indicated that she was influenced by NMF. What Cobb did not say to Judge Lawrence was the fact that Blute and Sosman had combined to have the session switched without the knowledge nor consent of Cobb's client. Judge Lawrence's Order though did not say who was to pay, only who was to be paid, and Rule 25 did not authorize any such sanction directly on the attorney.

Even the BC / BBO have backed away from their Indictment

Page 32 of 77

charge that this order somehow inured to Cobb personally. Cobb thus interpreted the order to mean that his clients were responsible for this payment, and so made that communication to his client. Nutter and Rose, meanwhile, wanted out of the case, so they filed for separate and final judgment, which was opposed with a motion to stay all sanction payments ordered in the case. Good Judge Herman Smith then ruled on the Motions, and specifically directed exactly what Cobb had already told Nutile, namely, that Cobb was to pay the $4,000 sanction as ordered by Judge Sosman, and "Cobb's client" was to pay the Lawrence sanction (aprox. $3,700.00), and that they had to do so by such and such a date. Exhibit 2.

So, from the Lawrence order forward, Cobb owed $4,000 and the Nutiles $3,700. None of that changed by dent of the Smith order, except that a time for payment was then ordered. But the Nutiles only sent Cobb $2,000 of the $3,700 that they had to pay. So, Cobb, being the kind of guy that he is, dug into his own pocket for not only the $4,000 he was slammed personally with, but for the difference between what the Nutiles owed ($3,700) and what they sent ($2,000.). Cobb was only re-payed this amount at the final closeout after settlement. The state's case depends on the notion that Cobb took sanction money from the Nutiles that they did not owe. The state never introduced any evidence that Cobb even for one second had possession of even one red cent of the Nutile's money which they sent in for sanctions prior to the Nutile's own obligation to pay sanctions themselves.

So, that's it. That's the sum total evidence of theft for which the undersigned gets disbarred. What a system! You know, the OBC and BBO apparently had trouble understanding what the appeals court panel did or said, since they first alleged it in the Indictment to be an "Affirmance" of an order which never existed, then they abandoned that notion once they were enlightened by the Smith order, at which point they argued that the said appeal's court speak was a "modification" of the "obviously erred" Smith order they never even knew about when they accused Cobb in public of being a thief. It is truly amusing how they can't even get their story straight as to what the non-"order" of the appeals court said, yet want to disbar Cobb since the exact same order is apparently so clear.

These charges are pressed against a guy who was never accused of taking a single dime from the millions of dollars which passed through his hands that he was legally required to properly distribute save this railroading? The state tags him a crook because he exposed graft? This case has never been about protecting the public from Matthew Cobb, rather it is about protecting these actors herein from the public.

**Imagine this system:**

The SJC declares that all lawyers indicted by the BC/BBO will be deemed guilty as charged. That it will adjudicate only the penalty therefore, but will do so after a full hearing on damages / mitigation before to a truly independent agency (say, the Mass Div. of Administrative Appeals) within a reasonably

short time period. So the first question becomes whether the above system "shocks the conscience". Well, it dispenses with the bother of evidence affecting liability when important property and Liberty rights may be at stake. It certainly violates procedural due process by striping away these rights without notice and opportunity to be heard. But does it not also violate substantive due process because it simply takes away a citizen's rights without rationale therefore which is related to some state interest? There could be no such interest, the "fair administration of Justice" notwithstanding which could justify such deprivation.

Yet that system would be **leaps and bounds MORE FAIR** than the present system presided over by the SJC. Why? Because it would eliminate upwards of ten years of mental torture, it would de-legitimize the credibility of their findings, and it would have no substantial effect on the conviction rate as it stands. In other words, it would show the BBO for what it is. As it stands, when Daddy tells daughter he is disbarred, daughter assumed that a credible, responsible, upstanding, trustworthy entity made such determination. All of which of course is untrue on these facts. But when a known sham did the rigging, nobody would give it credit, and all would call it sham. That's far easier to take, and it's no less then what the entire OBC / BBO system deserves.

This lawsuit is not a case where the federal Plaintiff all too predictably claims in misty eyed self pity that he was somehow framed through the unmitigated zeal of a state

prosecutor's parading of false witnesses against him. Rather, here, the state's own "evidence" - whatever its predetermined "credibility" assessment by the state's structurally biased "hearing" committee, see below - is legally incompetent to support any charge of theft, which "theft" is the state's admittedly sole disbarable offense. This faux "theft" driven deprivation of substantive Liberty then goes from bad to worse, procedurally. That is to say the state then hedges its otherwise assured statistical chance of conviction generally (see below discussion on structural defects) by here utilizing the long forbidden stealth infused trap of convicting (re: "theft") on an admittedly un-indicted (never cured by amendment, not even a post "hearing" amendment, <u>Ruffalo</u>, supra) "theft" charge. The said un-indicted "theft" charge still lacking of any support was dreamt up by the state prosecutor post "hearing" because evidence at the hearing had shown the indicted "theft" charge lacked any evidentiary basis.

**Second Substantive Due Process Argument -**

The state lawyer governance system is broken down, completely, assuming that it ever fairly worked at all during the now thirty year existence of the BBO. The fact that many lawyers are criminals is not justification for wholesale and arbitrary guilt findings for all lawyers simply upon indictment, and this de facto presumption of guilt unconstitutionally shifts the burden of proof from the state to the accused. To a statistical certainty, the system guarantees guilt for each and every lawyer

indicted which, as a practical matter, means that the results of the "hearings" are pre-determined, and only serve to humiliate and torture the accused while creating a self-serving trail of purely ostensible justice, which is not justice at all. The public is unaware of these outrageous statistics, due in no small measure to the BBO / OBC's keeping them from public view since about 1993. For those lawyers against whom formal disciplinary proceedings are brought, acquittals are so rare in the system that they are wholly arbitrary under the still rock solid guidance of Furman v. Georgia, 408 U.S. 238 (1972).

When thousands of prosecutions where death is available result in only 50 or so death sentences, the result is arbitrary. Furman, at 293.

This is the same as saying when 1750 lawyers are prosecuted, and innocence is a possibility in each case, yet only 15 or so survive, same thing.

So, these two above seemingly unrelated substantive due process problems of arbitrariness and caprice, one specific to Cobb, the other generally as to the long inept system itself, mesh together like a fine machine gears in a grinder in which innocence and guilt both go in, but only guilt comes out. These two wrongs will form a unique and constitutionally shameful synergy whenever the alleged substantive due process deprivation itself grows out of certain but baseless judicial punishment by the state in the state's own forum.

Cobb's situation here is much like walking up to the plate

with two strikes before you even swing. Here is the thought, counter-thought process involved:

One rightly surmises that the state has no evidence to disbar on theft, and their other charges relative, unbelievably, to exposing unethical acts by judges are also baseless because the law allows and / or requires me to do what I did so long as it was truth based. Strike One! Wake up and smell the coffee Cobb, you angered the wrong people and you had better dig in and wind down.

Oh well, says Cobb, at least I can easily show at the state "hearing" that the charges are baseless. Strike Two! Cobb, go and research the numbers, you have no statistical chance here at the BBO anyway.

Fine says me, I'll make federal constitutional arguments to the SJC, and they will not simply as they always do by footnote alone accept the so called  - in this case completely fabricated - factual "summary" handed to it by the BBO. Strike three, your out! Cobb, you of all people ought to know when to bail from a bad system, you should have sued them in federal court where at least your chances are above zero.

So, that's what I'm doing. I have no chance whatsoever of either the truth nor the federal constitution bearing any rational relation to my fate in the Massachusetts system. At least here, there is a fair chance of Justice. The Massachusetts system, for lack of better terms, truly is and has been a federal constitutional dead zone for years. The state of Massachusetts **in the area of lawyer governance** does this simply because it can still get away with it. It is clearly a system of men, that's privileged men, or men who are intimidated by the totalitarian rule of the BBO into standing mute when manifest judicial misconduct detrimentally affects their clients, and not of Laws. One would surmise that the BBO's job was to protect the public, not nail those lawyers who served the public interest by

attempting to weed out corruption in the courts.

The said system here desires total, arbitrary, and unfettered control over who it "allows" to practice law and who it wants out on the street because they laid the crosshairs of truth and public scrutiny on a judge(s) who, at a bare minimum, had a serious ethical lapse at the time, both as to her appearance and in fact. Under <u>Middlesex v. Garden State</u>, supra, every stitch of conduct at the OBC and BBO is attributable to the SJC. This profession needs a real spine when it comes to the all too utopian notion of self policing, not more hoards of the intimidation induced spineless. We cannot constitutionally and should not morally torture then disbar those who simply do their job by reporting unethical acts by judges.

Argument Three Re: Substantive Due Process - The state, by attempting to punish as an ethical violation a particular legal stance taken in a case, which stance one judge (Sosman, J.) found sanctionable, and, another (Collings, U.S.M.J.), meritorious, is arbitrary and capricious because reasonable people, like, for instance, these judges, differed over whether the exact same legal position was or was not valid, and, therefore, the state's punishment of the loser for ethical misconduct no less is irrational, and otherwise arbitrary and capricious.

<u>In re Ruffalo</u>, 390 U.S. 544 (1968), White and Marshall concurring, the Court said:
The conduct for which the Court of Appeals disbarred petitioner