cannot, however, be so characterized. Some responsible attorneys, like the judge who refused to order petitioner disbarred from practice in the Northern District of Ohio, 249 F.Supp. 432 (1965), would undoubtedly find no impropriety at all in hiring a railroad worker, a man with the knowledge and experience to select relevant information and appraise relevant facts, to "moonlight" __ work on his own time __ collecting data. On the other hand some, like the officials of the Mahoning County and Ohio State Bar Associations, would believe that encouraging a man to do work arguably at odds with his chief employer's interests is unethical. The appraisal of petitioner's conduct is one about which reasonable men differ, not one immediately apparent to any scrupulous citizen who confronts the question. n3 I would hold that a federal court may not deprive an attorney of the opportunity to practice his profession on the basis of a determination after the fact that conduct is unethical if responsible attorneys would differ in appraising the propriety of that conduct. I express no opinion about whether the Court of Appeals, as part of a code of specific rules for the members of its bar, could proscribe the conduct for which petitioner was disbarred.

**Forth Substantive Due Process Argument** - Cobb reported the misconduct or appearance of misconduct of two judicial officers some ten years ago. Cobb made at least one of these reports under the mandatory state regulations requiring him to report **prima facie** fraud on the Court. That said, a state may not, with the right hand, command such report independent of how offensive to some its content may be, yet, with the left, fatally back slap the messenger because the content was injurious to the reputation of a public official. Simultaneously compelling then punishing the exact same speech is not only completely irrational as adverse to the public interests, not only arbitrary and capricious, but the same otherwise makes mock of the notion of equal justice under the law and such intimidation keeps honest

Page 40 of 77

lawyers from doing their jobs for fear of receiving a fate similar to Cobb's as their reward. Moreover, you cannot command on report based on prima facie evidence, yet re-determine in hindsight that the event did not occur on preponderance basis consistent with substantive due process since the same is arbitrary.

**Abridgment of Free Speech**

**Overview** - Under any legal test from strict scrutiny to rational relationship, and wholly independent of motive, the government cannot rationally justify punishment for the protected speech in question and, though we can certainly guess, it is impossible to tell just how much the proceeding was poisoned once this illegal punishment is factored out, and, therefore, the entire proceeding is void. It is here uncontested that no insubstantial protion of the prosecution is overtly based on Cobb's speak as t these judges.

The Supreme Court of the United States has said time and again that - opinion aside - speech factually critical of the judiciary is of the utmost core public concern and remains the sole check on judicial authority run rampant. <u>Landmark</u>, supra.

We start with the basic tenant that in our great Union, a lawyer is an officer of the court, state and federal. This does not mean he is ipso facto a "state actor" under section 1983. He could be, but there would have to be more. What being an officer

of the court means is that you have sworn to uphold the law in our dual governments' most basic forums for truth, the public courthouses. To be meaningful, "upholding the law" precludes a knowing subversion of the truth, particularly when someone is disadvantaged thereby. In court, the law is then applied to the truth in order to reach a judgment. Thus, it's not so much a jury or other fact finder's mission to simply sort out facts, but, rather, to determine truth. That great mission fails if what we have determined as "truth" was a result of lies perpetrated on the court system.

Frankly, no even minimally competent lawyer should need a written rule codifying the above paragraph. It's common sense that the oath means that you do not lie, cheat, nor steal in this business. Such an oath however must likewise mean that you must report or otherwise expose those who do, or who were credibly reported to have done so, no matter who they are or what they did. You either understand what you are here for, or you don't, law school, bar exam, ethics exams, apprenticeships, and C.L.E. notwithstanding. Neither blurry words on coffee stained papers at midnight nor long winded sermons by supervisors in the law adequately inform such inherent conscience driven judgment.

It sometimes though takes courage to follow the above precepts. As history has shown in this matter and as will be seen below and at the trial of this matter, if you say in the Massachusetts state courts that an extremely popular up and coming judge acted unethically, then power will crush truth, indeed, the truth bearer, every time. The risk of this court not

Page 42 of 77

acting here is that this case against Cobb will have the very effect the state wants, namely, to chill, or, rather, to freeze solid, the speech of lawyers who dare to do their job.

Apart from the above duty to speak out, we have in this Union the Liberty of free speech. This most particularly includes the right to be openly critical of the government. Landmark, supra, essentially states that, AMOL, the public interests are critically served by exposing wrongdoing in the courts and are critically disserved by allowing the courts a club like atmosphere ruled by "self anointed priests".

As we will see below, Cobb's two statements critical of the judges in question were both made in now ancient court proceedings, one in 1994, another in 1995. And while Cobb's political beliefs certainly informed his decision to make those statements at the time, as set forth below, he certainly recognizes that courtrooms are not generally deemed proper forums for free political expression. However, courtrooms remain forums for the truth by definition, and that's really what we are looking for here.

A state cannot constitutionally compel lawyers under fear of the whip to report fraud on the court once **prima facie** (read: sufficient) evidence of such fraud has been uncovered on the one hand, yet then, on the other, punish that same messenger years later on an ancient hindsight weight or credibility based re-assessment, let alone because the person mentioned was a judge. And for this obvious point we need no "interpretation" of the regulation at hand, other than to simply determine that the

obligation truly springs forth on sufficiency. As we speak, the record at the BBO is **prima facie** that such a fraud was attempted, and that ends the issue on this particular alleged wrongdoing of Cobb which has been the driving force of the entire prosecution.

As to the other speak regarding Judge Sosman as seen above, what she did is undisputed, and the same unequivocally permits a reasonable inference of bias, because under both common sense and First Circuit law a judge is absolutely required to act when she is made aware of unethical conduct, as she was point blank on the transcript in open court by Cobb, rather than to urge it on then later appear to reward it as she did. As to the influence allegation, Cobb was flatly prevented contrary to First Amendment law of the Supreme Court from even creating a record establishing the same at the BBO by the BBO Chair himself.

We can all agree that every court has an obligation to prevent, and an extremely broad power to punish, including disbarment, any clear and present danger to the administration of justice. As seen below, in both instances of Cobb's speak relating to judicial officers, what was said was material to the issue then pending for the court's determination. In neither case was there any issue of prior restraint by, for instance, court order preventing anticipatorily any of the statements. So, the state's burden here will be to show factually just how it was that such a clear and present danger was created by Cobb's speak. This it can never do. Prior restraints aside, one cannot possibly create a clear and present danger to the administration of justice (meaning the pursuit of the truth) by speaking a **prima**

Page 44 of 77

*facie* truth bearing upon a material issue pending before the court for its determination. It is truly incredible that the entire lawyer governance system in Massachusetts has to be put before a federal court to understand this.

Quite telling here is the fact that the state has never put forth even one solitary fact as to how anything Cobb said about these judges was in any way a clear and present danger to the administration of justice. It probably would have if it could have, the upshot being that one cannot credibly articulate facts which do not exist. Instead, and comfortably insulated in its own cozy system which, save the odd IOLTA challenge, has never had to answer to outside authority, the apparent BBO theory here is that categorically a Massachusetts lawyer must never, ever say that a judge did anything unethical.

The BBO's theory here is apparently that judges, simply by their position, are somehow immune from allegations of misconduct, even when such misconduct in and of itself then presented a clear and present danger to the administration of justice because it either prejudiced or reasonably could have prejudiced a material, genuinely contested issue in the case. The state system has the right issue pegged, granted, but it has it exactly backwards, again having confused or transposed protecting the judiciary with protecting the public. Only the later has any constitutional merit.

No government official, most particularly a judge, has any such preferred status, or is otherwise immune from such criticism. It is truly beyond the constitutional pale to punish a

Page 45 of 77

lawyer simply because the acts he reported - which themselves presented a clear and present danger as such - related to judges. This notion, besides being absolutely absurd when the mission is truth, ignores the core of the Supreme Court's First Amendment law in this lawyer governance field, discussed immediately below.

The very best wager to make in Boston for years will be that the state's attorney in this matter will not be able to substantively discuss this case with the court without, within the first one hundred words, making the statements that Cobb "accused a judge of bias and of being influenced" or "accused a sitting federal judge of criminal conspiracy". The funny thing is that neither of these statements, as unpleasant and as unfortunate as they were for having to have been publicly made in the first place, are in and of themselves without more in any way unethical or otherwise improper for a lawyer to have made (the last statement being somewhat of a mischaracterization of what Cobb did or said, but why quibble). The issue here is whether these statements when made had any basis in the truth. So it's not content begetting content, rather, whether whatever content was stated had any truthful basis underlying it.

Hindsight is 20-20, but it would have been far better to have jailed Cobb then on criminal contempt. At least that way, Cobb, after first trimming up on bread and water while exhausting a futile run through the Massachusetts courts on this apparently sacred issue, could have put this federal constitutional issue in a federal court through a habeas corpus proceeding, and killed it dead then before its then young roots had time to grow into the

terminal legal cancer it has now become.

In Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 838 (1978), the Court held:

Landmark urges as the dispositive answer to the question presented that truthful reporting about public officials in connection with their public duties is always insulated from the imposition of criminal sanctions by the First Amendment. It points to the solicitude accorded even untruthful speech when public officials are its subjects, see, e. g., New York Times Co. v. Sullivan, 376 U.S. 254 (1964), and the extension of First Amendment protection to the dissemination of truthful commercial information, see, e. g., Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, 425 U.S. 748 (1976); Linmark Associates, Inc. v. Willingboro, 431 U.S. 85 (1977), to support its contention. We find it unnecessary to adopt this categorical approach to resolve the issue before us. We conclude that the publication Virginia seeks to punish under its statute lies near the core of the First Amendment, and the Commonwealth's interests advanced by the imposition of criminal sanctions are insufficient to justify the actual and potential encroachments on freedom of speech and of the press which follow therefrom. See, e. g., Buckley v. Valeo, 424 U.S. 1, 64_65 (1976).

In Mills v. Alabama, 384 U.S. 214, 218 (1966), this Court observed: "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." n11 Although [*839] it is assumed that judges will ignore the public clamor or media reports and editorials in reaching their decisions and by tradition will not respond to public commentary, the law gives "[judges] as persons, or courts as institutions . . . no greater immunity from criticism than other persons or institutions." Bridges v. California, 314 U.S. 252, 289 (1941) (Frankfurter, J., dissenting). The operations of the courts and the judicial conduct of judges are matters of utmost public concern.

. . .

Moreover, neither the Commonwealth's interest in protecting the reputation of its judges, nor its interest in maintaining the institutional integrity of its courts is sufficient to justify the subsequent punishment of speech at issue here, even on the assumption that criminal sanctions do in fact enhance the guarantee of confidentiality. Admittedly, the Commonwealth has an interest in protecting the good repute of its judges, like that of all other public officials. Our prior cases have firmly established, however, that injury to official reputation is an insufficient [*842] reason "for repressing speech that would otherwise be free." New York Times Co. v. Sullivan, 376 U.S., at 272_273. See also Garrison v. Louisiana, 379 U.S. 64, 67 (1964). The remaining interest sought to be protected, the institutional reputation of the courts, is entitled to no greater weight in the constitutional scales. See New York Times Co. v. Sullivan, supra. As Mr. Justice Black observed in Bridges v. California, 314 U.S., at 270_271:

"The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. . . . [An] enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect."

    Mr. Justice Frankfurter, in his dissent in Bridges, agreed that speech cannot be punished when the purpose is simply "to protect the court as a mystical entity or the judges as individuals or as anointed priests set apart from the community and spared the criticism to which in a democracy other public servants are exposed." Id., at 291_292.

Properly [*843] applied, the [clear and present danger] test requires a court to make its own inquiry into the imminence and magnitude of the danger said to flow from the particular utterance and then to balance the character of the evil, as well as its likelihood, against the need for free and unfettered expression. The possibility that other measures will serve the State's interests should also be weighed.

In Pennekamp v. Florida, supra, at 335, Mr. Justice Reed observed that this Court is

"compelled to examine for [itself] the statements in issue and

the circumstances under which they were made to see whether or not they do carry a threat of clear and present danger to the impartiality and good order of the courts or whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect."

Mr. Justice Brandeis was even more pointed in his concurrence in Whitney v. California, 274 U.S. 357, 378_379 (1927):

"[A legislative declaration] does not preclude enquiry into the question whether, at the time and under the circumstances, [*844] the conditions existed which are essential to validity under the Federal Constitution. . . . Whenever the fundamental rights of free speech and assembly are alleged to have been invaded, it must remain open to a defendant to present the issue whether there actually did exist at the time a clear danger; whether the danger, if any, was imminent; and whether the evil apprehended was one so substantial as to justify the stringent restriction interposed by the legislature."

It was thus incumbent upon the Supreme Court of Virginia to go behind the legislative determination and examine for itself "the particular [utterance] here in question and the circumstances of [its] publication to determine to what extent the substantive evil of unfair administration of justice was a likely consequence, and whether the degree of likelihood was sufficient to justify [subsequent] punishment." Bridges v. California, 314 U.S., at 271. Our precedents leave little doubt as to the proper outcome of such an inquiry.

[***HR13]   [13]
In a series of cases raising the question of whether the contempt power could be used to punish out_of_court comments concerning pending cases or grand jury investigations, this Court has consistently rejected the argument that such commentary constituted a clear and present danger to the administration of justice. See Bridges v. California, supra; Pennekamp [*845] v. Florida, supra; Craig v. Harney, 331 U.S. 367 (1947); Wood v. Georgia, 370 U.S. 375 (1962). What emerges from these cases is the "working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished," Bridges v. California, supra, at 263, and that a "solidity of evidence," Pennekamp v. Florida, supra, at 347, is necessary to make the requisite showing of imminence. "The danger must not be remote or even probable; it

must immediately imperil." Craig v. Harney, supra, at 376.

[\*\*\*HR14]   [14]
The efforts of the Supreme Court of Virginia to distinguish those cases from this case are unpersuasive. The threat to the administration of justice posed by the speech and publications in Bridges, Pennekamp, Craig, and Wood was, if anything, more direct and substantial than the threat [\*\*1545] posed by Landmark's article. If the clear_and_present_danger test could not be satisfied in the more extreme circumstances of those cases, it would seem to follow that the test cannot be met here. It is true that some risk of injury to the judge under inquiry, to the system of justice, or to the operation of the Judicial Inquiry and Review Commission may be posed by premature disclosure, but the test requires that the danger be "clear and present" and in our view the risk here falls far short of that requirement. Moreover, much of the risk can be eliminated through careful internal procedures to protect the confidentiality of Commission proceedings. n13 Cf. Nebraska Press Assn. v. Stuart, 427 U.S., at 564; id., at 601 n. 27 (BRENNAN, J., concurring in judgment). In any event, we must conclude as we did in Wood v. Georgia, that "[the] type of 'danger' evidenced by the record is precisely one of the types of activity envisioned by the Founders in presenting the First Amendment for ratification." 370 U.S., at 388.

It is true that Landmark dealt factually with an out of court statement, but the principals above are braod based, and applicable to speaking the truth in a non-contempt setting in a courtroom or legal paper.

In Wood v. Georgia, 370 U.S. 375, 391 (1962), the Court held that:

[the] effort by the petitioner to prove the truth of his allegations was rejected, the court holding irrelevant the truth or falsity of the facts and opinions expressed in the publications. 103 Ga. App. 305, 321, 119 S. E. 2d 261, 273. If the petitioner could be silenced in this manner, the problem to the people in the State of Georgia and indeed in all the States becomes evident.

Page 50 of 77

**Second Free Speech Deprivation here -**

There exists a fair preponderance of the evidence, some direct by admission and some circumstantial via the government(s patently false and pretextual "theft" and "public protection" articulations, establishing that Cobb's protected speech on matters of public concern was a substantial factor motivating the government's prosecution / retaliation and punishment of him, and such illegal motivation has poisoned the entire prosecution. This is simply a pretext analysis. It gfo like so: Since the state articulated bases are somewhat incredible for the punishment, we are allowed to infer an illegal unstated reason. Here, the state admits in part that it came after Cobb for this speech anyway.

This issue will be more fully developed as time allows, but is fairly straightforward on these facts.

**Procedural Due Process**

Argument ONE - Prosecutorial Misconduct -

About six years after the events at hand, in October 2000, and while Cobb was still suffering daily for almost that entire time under a cloud of suspicion regarding the case(s) giving rise to this matter which had been parked at the BBO to his detriment, OBC prosecutor, Rabe, in her so called "investigative" role, went to Cobb's ex-clients, Nutiles, and intentionally tricked and otherwise economically coerced them into going along in part with

Rabe'(s manufactured story of "theft" on her promise to them that she would "get their money back" from Cobb (there was no such money to get back). In the process, Rabe - notwithstanding the BBO's own privacy rules which flatly prohibited the same - further coerced the Nutiles by telling them that "we [meaning the BBO, not the OBC with whom she was employed. Yet both the OBC and BBO claim total independence, autonomy, and privacy from each other entity] have a big case" pending against Cobb (meaning another case), and that Cobb was "going to be suspended", among other things.

Now, this "information" given by Rabe curiously was possessed roughly one year before the "hearing" was even to begin and was also four months **pre-indictment**. Rabe then went on to continue to misrepresent "evidence" throughout the so called "proceedings" - including the Comstock Lode itself of maintaining the "theft" claim after it was exposed for what it was, frivolous. Moreover, she in the end colluded with a state witness, Blute, to have him state his baseless "belief" that Cobb had taken money from the Nutiles, a "belief" contradicted by that own witness's prior words, and which "belief" as above was wholly incompetent AMOL as "evidence", and which "evidence" was the only such thing in "support" as above of the state's "theft" charge.

In <u>Figueroa Ruiz v. Delgado</u>, 359 F.2d 718 (1st.Cir.1966), the Court held:

n6 The Commonwealth's brief, perhaps to build up its position, overstates the duties of HN2a public prosecutor. It fails to recognize that he, too, has a duty not to convict an innocent

Page 52 of 77

person even though he might be able to make a case against him. Cf., e.g., Alcorta v. State of Texas, 1957, 355 U.S. 28, 78 S. Ct. 103, 2 L. Ed. 2d 9. Id., at 720.

**Procedural Due Process Argument TWO - Lack of Fair Trial - Judicial Bias -**

There was no fair trial at the BBO as against Cobb. Admittedly as above, the outcome was decided long before the "hearing" started. One of the "hearing" officers entrusted to decide the facts had long known the state's judge key witness on one charge and the BBO would not force her to step down over Cobb's Objections. The "theft" charge by Rabe design became a moving target **after the evidence had closed** because she knew the SJC consistently allowed - in violation of the Supreme Court's Ruffalo case, infra, - these procedural shenanigans at the BBO. Manifestly Overt Bias was otherwise exhibited at the BBO "hearings" through prohiiting / harassing Cobb for his attempts to introduce the exact same evidence which BC was freely allowed to do without so much as a whisper from the BBO.

There's far more to here say on this point, but this Brief is way too long already.

**Procudural Due Process Argument THREE - Bad Indictment - Ruffalo**

As to the "theft", which is admittedly the sole determining factor tipping the scales to disbarment (permanent deprivation of Cobb's reputational liberty interest), the government's indictment cannot be reconciled with its findings within the constraints of procedural due process. Due process requires that

Page 53 of 77

the government cannot convict in a criminal nor (as is this) a "quasi-criminal" case on an un-indicted finding of "theft". This "theft" conclusion against Cobb is one for which no indictment of any sort was ever made, not originally, not by amendment. The government waited to announce its complete abandonment of its "theft" theory/ facts charged in the original Indictment only after the evidence was completely closed. Secondly, apart from such transparent bait and switch, the government here simultaneously invoked and deprived Cobb's Liberty interest in this matter through its RICO like clearly substantive "findings" of so called "[pattern]" or "[conduct as a whole]", neither of which were specified in any remote fashion in the Indictment nor were reasonably anticipated as substantive charges to have to be even defended against.

**What was actually charged** - the original indictment charged that the Massachusetts Appeals Court had "affirmed" an order of a single Appeal's Court Justice (Lawrence,J.) which  - according to the indictment - supposedly directed Cobb to personally pay a sanction of about $3,700. Cobb, so the theory went, then lied, cheated, or otherwise ripped off his client by having her pay his bill for him.

Upon reading these false charges in the Indictment in February 2001, Cobb responded by way of Answer, to which he attached a trial court order, Exhibit 2 hereto, which completely debunked the government's entire "theft" theory based as it was upon the "affirmance" of an Order which never existed. Cobb there pointed out that the particular sanction above mentioned, to the

Page 54 of  77

penny, was not only never directed specifically at him by Judge Lawrence as recklessly charged, but, moreover, the trial court Judge (Smith) had specifically ordered that Cobb's client pay the sanction, Exhibit 2, and that the said Smith order was complied with in every regard.

After receiving Cobb's Answer, the state prosecutor then admitted in an Affidavit filed in Suffolk Superior Court no less that she "was not aware" - despite the same information having been provided to her previously by Cobb - of the Smith Order directing Cobb's client, not Cobb, to pay the sanction. So much for the "theft" charge, or so one would think.

Undeterred by such utter nonsense as facts, law, and orders of the court, the government prosecutor simply recast its theory to the government sponsored tribunal immediately after the evidence closed. Its new post evidence position was that the above said Appeals Court "affirmance" as alleged initially was now not an "affirmance" at all. Rather, it had magically become an: (1) "order"; (2) "directing Cobb" to do something (we still do not know what); (3) which now "modified", (4) an "obviously erred" Smith Order. Moreover, the entire indicted allegation that Single Justice Lawrence's Opinion had Ordered Cobb to do anything was completely and forever abandoned without one word's explanation since it was proven to be non-existent and was irreconcilable with Judge Smith's specific Order as above. The state prosecutor, now stuck with the reality of Smith's order and no reversal nor modification of the same, ever, simply did what it did in the original indictment, namely, continue to lie.

However, in spite of the newfound, post "hearing" un-alleged recast "indictment", for lack of better terms, not one scintilla of competent evidence was ever put on to show that: (1) the Lawrence Order directed Cobb to do anything; (2) the Appeals Court's purported across the board "affirmance" was an "order" of any sort, let alone an "order" directing Cobb to do or pay something; (3) the Appeal's Court's purported "affirmance" was now somehow an unstated "modification" of Judge Smith's Order without using the word "modified", and (4) Judge Smith's specific Order was somehow "erred". That's zero.

As previously pointed out in the substantive due process argument, supra, the obligation for the Nutiles to pay their $3700.00 arose the instant Judge Lawrence gave his Order, the same Order that both Cobb, and, subsequently, Judge Smith correctly interpreted to inure to the Nutiles. But even if the obligation to the Nutiles arose as late as the Smith Order, the simple fact is that Cobb never received even one cent of any contribution by the Nutiles towards any sanction amount until after the Nutile's had the obligation to pay. The state has never shown how it is that the Nutiles, owing some $ 3700.00, yet only paying $2000., had given to Cobb for his disbursement anything whatsoever that they were not obligated to give. Unfortunately in the system we are analyzing, this sort of non-evidence and all too obvious prosecutorial misconduct does not ever affect the statistical certainty of guilt anyway.

The case of In Re Ruffalo, 390 U.S. 544 (1968) bars such moving target indictments in bar discipline cases on due process

grounds. In Ruffalo, the Court held that:

As noted, the charge (No. 13) for which petitioner stands disbarred was not in the original charges made against him. It was only after both he and Orlando had testified that this additional charge was added. Thereafter, no additional evidence against petitioner relating to charge No. 13 was taken. Rather, counsel for the county bar association said:

"We will stipulate that as far as we are concerned, the only facts that we will introduce in support of Specification No. 13 are the statements that Mr. Ruffalo has made here in open court and the testimony of Mike Orlando from the witness stand. Those are the only facts we have to support this Specification No. 13."

Id., at 549.

The Court then went on to hold:

Disbarment, designed to protect the public, is a punishment or penalty imposed on the lawyer. Ex parte Garland, 4 Wall. 333, 380; Spevack v. Klein, 385 U.S. 511, 515. He is accordingly entitled to procedural due process, which includes fair notice of the charge. See In re Oliver, 333 U.S. 257, 273. It was said in Randall v. Brigham, 7 Wall. 523, 540, that when proceedings for disbarment are "not taken for matters occurring in open court, in the presence of the judges, notice should be given to the attorney of the charges made and opportunity afforded him for explanation and defence." Therefore, one of the conditions this Court considers in determining whether disbarment by a State should be followed by disbarment here is whether "the state procedure from want of notice or opportunity to be heard was wanting in due process." Selling v. Radford, 243 U.S. 46, 51.

In the present case petitioner had no notice that his employment of Orlando would be considered a disbarment offense until after both he and Orlando had testified at length on all the material facts pertaining to this phase of the case. As Judge Edwards, dissenting below, said, "Such procedural violation of due process would never pass muster in any normal civil or criminal litigation." n3 370 F.2d, at 462.

Id., at 551.

These are adversary proceedings of a quasi_criminal nature. Cf. In re Gault, 387 U.S. 1, 33. The charge must be known before the proceedings commence. They become a trap when, after they are underway, the charges are amended on the basis of testimony of

the accused. He can then be given no opportunity to expunge the earlier statements and start afresh. n4

n4 The Ohio State Bar Association and Mahoning County Bar Association, amici curiae in support of the order of the Court of Appeals, argue that there was no due process violation because the State Board gave petitioner several months to respond to charge No. 13. This argument overlooks the fact that serious prejudice to petitioner may well have occurred because of the content of the original 12 specifications of misconduct. He may well have been lulled "into a false sense of security" ( Bouie v. City of Columbia, 378 U.S. 347, 352) that he could rebut charges Nos. 4 and 5 by proof that Orlando was his investigator rather than a solicitor of clients. In that posture he had "no reason even to suspect" (ibid.) that in doing so he would be, by his own testimony, irrevocably assuring his disbarment under charges not yet made. (bolding added).

How the charge would have been met had it been originally included in those leveled against petitioner by the Ohio Board of Commissioners on Grievances and Discipline no one knows.

Id., at 552.

This absence of fair notice as to the reach of the grievance procedure and the precise nature of the charges deprived petitioner of procedural due process.

Reversed.

In Ruffalo, at least the lawyer **was able to see** the amended indictment and arguably prepare to defend against it. Even still, it was unconstitutional essentially because it was a trap for which he never expected to have to defend against. See Ruffalo FN 4 above. Here, there was no amended indictment, nor time to prepare for countering it (admittedly the state lacked evidence of theft anyway, but this conduct is highly relevant to its true motivation to retaliate for speech assertion). Moreover, the theory here as to the eleventh hour reconstituted charge of theft was shear lunacy as above, apart from its completely fraudulent

Page 58 of 77

contrived factual basis. Any lawyer making that sort of theoretically inept and intentionally misrepresentation premised argument in this federal court would surely be sanctioned and, we now ironically come full circle, potentially reported to the BBO.

The point in Ruffalo was that the specific factual allegations of misconduct - the theory of the case if you will - had completely changed post hearing based on the results of the hearing, exactly as here, where the "hearing" served to completely debunk the alleged "theft" theory as above. Curative amendments did not alter the constitutional deprivation, as it was irrelevant whether the lawyer had been given additional time to defend. Moreover, in Ruffalo, it was irrelevant whether the same originally alleged generalized morality based ethical precept was said to be violated by both the indicted, but abandoned, charge, and by what was supposedly later proved in the amended indictment. Namely, the said ethical precept charged was a generalized deception and moral unfitness. The Court described the originally alleged factual underpinnings supporting such charge as "soliciting ... clients through an agent". Id., at 546. As to the "proved", through amended indictment, factual charge of essentially using another to obtain information from his employer, the Ohio Supreme Court also described the same as one of moral unfitness. Id., at 547.

One of the above discussed reasons why Younger Abstention was here inappropriate was because its third affirmative prong (i.e., presumption of "adequate opportunity" of state to resolve the accused's federal claims) was not supported by the SJC's record of

Page 59 of 77