rejecting each and every due process argument ever made in the BBO context. This rejection included what at a minimum can easily be seen as complete disrespect for the indictment rule of Ruffalo, which requires that one may not be convicted of a factual charge not specified in the indictment.

Namely, the SJC has unfortunately misstates the Rule such that there is no due process violation so long as at least one broad, generalized ethical rule violation (for instance "prejudicial to administration of justice", which is found in virtually all indictments, including Cobb's) of state's original indictment is "proved" by whatever stealth the OBC can effect before its co-tenants at the BBO. See Matter of Saab, 406 Mass. 315, 323-24 (1989).

In Saab, to rationalize the fact that the lawyer was charged under an entirely different theory than the indictment in violation of Ruffalo, the SJC cited Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 654 (1985), for the proposition that "the United States Supreme Court has held, however, that a disciplinary authority may find an attorney's conduct deficient on an entirely different theory from the one argued by the investigative or prosecuting agency". Saab at 324. This is simply not accurate, as the purported quote from Zauderer, part VI, was by the undersigned's research clearly a plurality opinion, which did nothing therefore to upset the rule of Ruffalo, which Part VI no less was severely criticized on essentially Ruffalo due process grounds by two members of the Court. Id, at 656.

We therefore need not wait to find out that which we already know, namely, that the SJC will continue to interpret Supreme Court case law to regarding due process protection in disciplinary proceedings such that no due process violation will ever be found by the faulty indictments as here by the OBC and BBO, as agents of the SJC.

In Saab, the SJC also incredibly rejects the notion that un-indicted "pattern" and "conduct as a whole" FINDINGS are improper since the multiple Counts themselves somehow indicate that they will be considered as a whole. That's like saying that a citizen ought to know that each and every traffic ticket one receives beyond his first carries with it a mystical recidivism charge that cannot be found anywhere in the statutes. The Court simply states THAT this indication exists, without providing a basis therefore. Id., at 323. This too violates the indictment rule of Ruffalo, in the most extreme sense imaginable.

Nowhere is it alleged in Cobb's indictment that he will be subjected to new substantive charges of "pattern" or "conduct as a whole", and these clearly substantive charges cannot themselves be found in the disciplinary rules. But this is what happened. Saying that "prejudicial to the administration of Justice" somehow puts all Defendants on notice that aged and stacked Counts against him will be separately considered on some totality basis really shows the depth of fundamental due process concerns that the SJC unfortunately ignores in this area. These un-indicted, prosecution by ambush charges and the free license therefore only serve to shore up the argument that anything goes due process wise before

this system in bar discipline cases.

Under RICO for instance, a federal prosecuter at least has to charge "pattern" of racketeering activity, and separately prove each and every predicate act therefore, among other things which must be alleged to be found. The Defendant knows from the outset that he must disprove "pattern", since the same is an element of te substantive RICO charge. Even with this procedural protection, RICO remains extremely potent prosecutorial tool simply because of it's Blakey devised "pattern" which serves at time to gain convictions where conventional tools have failed. In Cobb's case, "conduct as a whole" as above and "theft", both symbiotically combined into the recommendation for disbarment.

In <u>Zauderer</u> at 669, one of the two Justices who sharply criticized the plurality portion of <u>Zauderer,</u>  which plurality Opinion was quoted without such obviously limiting qualification by the SJC in <u>Saab</u> so as to defeat the Rule of <u>Ruffalo</u> with stare decisis therefore, said:


The Court appears to concede these serious problems, noting that "it may well be that for Ohio actually to disbar an attorney on the basis of its disclosure requirements as they have been worked out to this point would raise significant due process concerns." Ibid. (emphasis added). The Court "[sees] no infirmity" in this case, however, because the Supreme Court of Ohio publicly reprimanded Zauderer rather than disbarring him. Ante, at 654, n. 15. This distinction is thoroughly unconvincing. When an attorney's constitutional rights have been violated, we have not hesitated in the past to reverse disciplinary sanctions that were even less severe than a public reprimand. n14 Moreover, a public reprimand in Ohio exacts a potentially severe deprivation of liberty and property interests that are fully protected by the Due Process Clause. The reprimand brands Zauderer as an unethical attorney who has violated his solemn oath of office and committed a "willful breach" of the Code of Professional Responsibility, and

it has been published in statewide professional journals and the official reports of the Ohio Supreme Court. n15 This Court's casual indifference to the gravity of this injury inflicted on an attorney's good name demeans the entire legal profession. n16 In addition, under Ohio law "[a] person who has been . . . publicly reprimanded for misconduct, upon being found guilty of subsequent misconduct, shall be suspended for an indefinite period from the practice of law or permanently disbarred . . . ." Govt. Bar Rule V(7). In light of Ohio's vague rules, the governing authorities' refusal to provide clarification and guidance to Zauderer, and the Ohio Supreme Court's "failure to specify precisely what disclosures [are] required," ante, at 653, n. 15, Zauderer will hereafter publish advertisements mentioning contingent fees only at his peril. No matter what disclaimers he includes, Ohio may decide after the fact that further information should have been included and might, under the force of its rules, attempt to suspend him indefinitely from his livelihood. Such a potential trap for an unwary attorney acting in good faith not only works a significant due process deprivation, but also imposes an intolerable chill upon the exercise of First Amendment rights. See supra, at 665_666, and n. 8. n17

n16 "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him," due process guarantees must scrupulously be observed. Wisconsin v. Constantineau, 400 U.S. 433, 437 (1971). See also Board of Regents v. Roth, 408 U.S. 564, 573 (1972) (same with respect to "any charge . . . that might seriously damage [a person's] standing and associations in his community"); Paul v. Davis, 424 U.S. 693, 722_723 (1976) (BRENNAN, J., dissenting) ("[The] enjoyment of one's good name and reputation has been recognized repeatedly in our cases as being among the most cherished of rights enjoyed by a free people, and therefore as falling within the concept of personal 'liberty'").(bolding added).

The Office of Disciplinary Counsel charged that Zauderer's drunken driving advertisement was deceptive because it proposed a contingent fee in a criminal case - an unlawful arrangement under Ohio law. Amended Complaint paras. 3_7, App. 22_23. Zauderer defended on the ground that the offer of a refund did not constitute a proposed contingent fee. This was the sole issue concerning the drunken driving advertisement that the Office complained of, and the evidence and arguments presented to the Board of Commissioners were limited to this question. The Board, however, did not even mention the contingent_fee issue in its certified report. Instead, it found the advertisement "misleading

and deceptive" on the basis of a completely new theory - that as a matter of "general knowledge" as discerned from certain "Municipal Court reports," drunken driving charges are "in many cases . . . reduced and a plea of guilty or no contest to a lesser included offense is entered and received by the court," so that in such circumstances "the legal fee would not be refundable." App. to Juris. Statement 11a. Although Zauderer argued before the Supreme Court of Ohio that this theory had never been advanced by the Office of Disciplinary Counsel, that he had never had any opportunity to object to the propriety of judicial notice or to present opposing evidence, and that there was no evidence connecting him to the alleged practice, the court adopted the Board's findings without even acknowledging his objections. 10 Ohio St. 3d, at 48, 461 N. E. 2d, at 886. Id., at 670-71.

Zauderer of course might not ultimately be able to disprove the Board's theory. The question before the Court, however, is not one of prediction but one of process. "A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense - a right to his day in court - are basic in our system of jurisprudence." In re Oliver, 333 U.S. 257, 273 (1948). Under the Due Process Clause, "reasonable notice" must include disclosure of "the specific issues [the party] must meet," In re Gault, 387 U.S. 1, 33_34 (1967) (emphasis added), and appraisal of "the factual material on which the agency relies for decision so that he may rebut it," Bowman Transportation, Inc. v. Arkansas_Best Freight System, Inc., 419 U.S. 281, 288, n. 4 (1974). These guarantees apply fully to attorney disciplinary proceedings because, obviously, "lawyers also enjoy first_class citizenship." Spevack v. Klein, 385 U.S. 511, 516 (1967). Where there is an "absence of fair notice as to the reach of the grievance procedure and the precise nature of the charges," so that the attorney is not given a meaningful opportunity to present evidence in his defense, the proceedings  violate due process. In re Ruffalo, 390 U.S., at 552 (emphasis added). n18 . Id., at 672.

n18 The Court attempts to distinguish Ruffalo by explaining that the absence of fair notice in that case caused the attorney to give exculpatory testimony that, after it prompted the inclusion of additional charges, became inculpatory. Ante, at 655, n. 18. In the instant case, the Court assures, the absence of fair notice was not "particularly offensive" because it simply led Zauderer to refrain from presenting evidence that might have been exculpatory rather than to present evidence having an inculpatory effect. Ibid. This constricted interpretation of due process guarantees flies in the face of what I had thought was an "immutable" principle of our constitutional jurisprudence - that "the evidence

used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." Greene v. McElroy, 360 U.S. 474, 496 (1959).

The Court acknowledges these guarantees, but argues that the Board's change of theories after the close of evidence was "of little moment" because Zauderer had an opportunity to object to the Board's certified report before the Supreme Court of Ohio. Ante, at 654. This reasoning is untenable. Although the Supreme Court of Ohio made the ultimate determination concerning discipline, it held no de novo hearing and afforded Zauderer no opportunity to present evidence opposing the Board's surprise exercise of judicial notice. Under Ohio procedure, the court's role was instead limited to a record review of the Board's certified findings to determine whether they were "against the weight of the evidence" or made in violation of legal and procedural guarantees. Cincinnati Bar Assn. v. Fennell, 63 Ohio St. 2d 113, 119, 406 N. E. 2d 1129, 1133 (1980). n19 All that Zauderer could do was to argue that the Board's report was grounded on a theory that he had never been notified of and that he never had an opportunity to challenge with evidence of his own, and to request that proper procedures be followed. n20

Here, Cobb defeated the charged claim of theft, hands down, only to be shocked at the closing upon hearing the words "disbarment". "Affirmance" and "modification" cannot be reconciled.

## Procedural Due Process Theory THREE –

The government's undue pre-indictment delays in this matter, stretching an average of 6 1/2 years on the only two claims which here even merit any serious discussion, were effected with a manifest intent to gain unfair advantage, and the same caused severe prejudice to Cobb's rights.

Let us begin generally. In order to even plausibly postulate that the OBC / BBO do not systematically and intentionally combine, as a matter of course, to use their free unfettered

license to affect severe, completely unregulated, undue delays to gain unconstitutional advantage in Bar proceedings, one would, among other things discussed below, have to assume that they cannot even read. Because if they could, they would surely derive much solace, encouragement, and safe harbor enablement for such practices from their Supervisor's (the SJC) Opinions which clearly encourage and enable the following conduct:

**ONE** - Undue delay, pre-indictment especially. No time limitations (read: Statute of Limitations) of any sort whatsoever as to any aspect of any case which OBC decides to bring no matter how much time has elapsed, will ever be enforced, under any circumstances, even in cases wherein the lawyer was punished 16 years after the act, or 10 years after as here, and even after the Bar has complained of this untoward practice in the Local Lawyer's Weekly. The state cannot show that it allows such aberrations in any other field, apart from its regulation of the practice of law. The manifest legal presumption of undue prejudice and deliberate indifference to constitutional rights logically and practically attached to this disgrace is clearly shifted from the state to the accused to show prejudice. If the state waited 50 years to indict a lawyer on his death bed, would he still have to show prejudice under this system? All indications thus far are "yes". The lack of Limitations in these regards is *per se* unconstitutional.

**TWO** - No prohibition against the "stacking" of multifarious Counts upon one another. By routine undue delay of one-half decade or so, it takes not a rocket scientist to deduce that more charges may

trickle in, which can then be combined into a multiple indictment, in which the standard bearer argument, below, of "pattern" and "conduct as a whole" can then be made, despite lack of indictment as to these terms and despite any ethical rule remotely even addressing them. This routinely allows for a RICO like "pattern" substantive charge to be used to ambush the unwitting lawyer who naively believes he actually has anything other than an arbitrary chance in the system. Any relatively short statute of limitations commanding swift action from the BBO would eliminate this unfair advantage since cases would be resolved before some other otherwise unrelated and perhaps otherwise frivolous charge drifted in 4 1/2 years later, as here, preventing the "pattern" ambush. Bar opinions in Massachusetts wherein the BBO did not "credit" the validity of other Counts of the indictment based on completely separate charges in time, place, and manner in order to argue "pattern" are not that common according t the undersigned's research.

**THREE** - No limitations at all about convicting on unindicted "pattern" and "conduct as a whole" charges, which of course are never set forth in the indictment, because the SJC says they do not have to be.

It's only common sense that a parent who gives cigarettes, matches, and a smoking room to his child cannot credibly deny that the child is not encouraged thereby to smoke. Enabling as such on the one hand, while preaching against the ills of smoking on the other, can hardly be said to discourage smoking.

**Why Cobb suffered actual and substantial prejudice on account of these unconstitutional practices.**

First, the most important witness in the so called "Jaraki" matter, Dr. Jaraki himself, who could testify as to what he heard about the judge speaking with her ex-client who thereafter "forgot" what he knew since others had told him that it "would be unethical" for him to testify, had long since moved out of state and perhaps Country. While the event giving rise to the so called ethical breach occurred in March 1995, and while the litigation itself continued through Spring of 1998 meaning Jaraki was then available to testify, the indictment came down in February, 2001, some three years after contact between Jaraki and Cobb was lost. Given the structural deficiencies in the system as above, it truly is hard to imagine that the delay was not intentional, particularly when the state then called a witness, the Judge no less, to **voluntarily** testify as to the absence of that very conversation over Cobb's Objection.

**Second,** the state had charged Cobb with not telling the Nutiles that Sosman had sanctioned him personally, but the Nutiles were in the Courtroom when Judge Sosman said this and this is undisputed on the Court transcript!!! Undeterred, Rabe then economically coerced as above Nutile **seven years later when the money was all gone** to what to say about the "hearing". He basically knew nothing but what he was coerced to say by Rabe, such as "[he] was in the back and could not hear" words that both he and his wife had come all the way to Boston to hear!!! He said

Page 68 of  77

"Cobb called us and said that he, I mean we, had been sanctioned". Moreover, **THIRD** prejudice wise is the immense psychological and emotional distress which the undersigned endured and can easily attest to while trying to continue to be successful at his practice with actual pre-indictment open "investigations" pending and unresolved for at least 5 1/2 years.

In U.S. v. Marion, 404 U.S. 307 (1971), the U.S. Supreme Court discussed delays of constitutional import in criminal matters. The Fourteenth Amendment due process concerns embodied therein come to the fore in a quasi-criminal bar discipline matter. Marion primarily concerned itself with speedy trial issues invoked post indictment, which issues are not here claimed as a right that Cobb enjoys in a bar discipline proceeding. However, as to pre-indictment delay, controlled as it is by Statutes of Limitation and the due process clause of the Fourteenth Amendment, the Court stated, at 315, FN8, that:

Most courts of appeals have recognized the Sixth Amendment right to a speedy trial only after a prosecution has been formally initiated or have held that the sole safeguard against pre-indictment delay is the relevant statute of limitations. ... (bolding added and long string citation omitted) ... . Some courts of appeals have stated that pre-indictment delay may be cause for dismissal but they have seemed to treat the question primarily as one of due process (although the Sixth Amendment is occasionally mentioned) and have required a showing of actual prejudice: (bolding added and long string citation omitted) ... . Although Petition of Provoo, 17 F.R.D. 183 (Md.), aff'd sub nom. United States v. Provoo, 350 U.S. 857 (1955), is sometimes cited for the proposition that pre-indictment delay will justify dismissal, the District Court explicitly stated that it considered this delay to be relevant only on the issue of whether the defendant had been denied a fair trial. 17 F.R.D., at 202. In Taylor v. United States, 99 U. S. App. D. C. 183, 238 F.2d 259 (1956), a conviction

was vacated where there had been a six_year delay between the
crime (housebreaking) and trial, 3 1/2 years of which was a delay
between crime and indictment; the defendant had been in prison on
another charge during this time, and the defendant was
substantially prejudiced in his ability to defend against the
housebreaking charge. The Court of Appeals stated: "We do not rely
on the mere lapse of time between the commission of the offenses
and the date of indictment, considered by itself, for that is
governed by the statute of limitations. It is the combination of
the factors set forth above [post-indictment delay, prejudice]
which motivates our decision." Id., at 186, 238 F.2d, at 262.


The <u>Marion</u> Court, at 322-23, went on to discuss how it is that the

due process clause itself protects pre-indictment delays:


The law has provided other mechanisms to guard against possible as
distinguished from actual prejudice resulting from the passage of
time between crime and arrest or charge. As we said in United
States v. Ewell, supra, at 122, "the applicable statute of
limitations . . . is . . . the primary guarantee against bringing
overly stale criminal charges." (bolding added) Such statutes
represent legislative assessments of relative interests of the
State and the defendant in administering and receiving justice;
they "are made for the repose of society and the protection of
those who may [during the limitation] . . . have lost their means
of defence." Public Schools v. Walker, 9 Wall. 282, 288 (1870).
These statutes provide predictability by specifying a limit beyond
which there is an irrebuttable presumption that a defendant's
right to a fair trial would be prejudiced. n14 As this Court
observed in Toussie v. United States, 397 U.S. 112, 114_115
(1970):

"The purpose of a statute of limitations is to limit exposure to
criminal prosecution to a certain fixed period of time following
the occurrence of those acts the legislature has decided to punish
by criminal sanctions. Such a limitation is designed to protect
individuals from having to defend themselves against charges when
the basic facts may have become obscured by the passage of time
and to minimize the danger of official punishment because of acts
in the far-distant past. Such a time limit may also have the
salutary effect of encouraging law enforcement officials promptly
to investigate suspected criminal activity."

There is thus no need to press the Sixth Amendment into service to
guard against the mere possibility that pre-accusation delays will

prejudice the defense in a criminal case since statutes of limitation already perform that function.

n14 The Court has indicated that criminal statutes of limitation are to be liberally interpreted in favor of repose. United States v. Habig, 390 U.S. 222, 227 (1968). The policies behind civil statutes of limitation are in many ways similar. They "represent a public policy about the privilege to litigate," Chase Securities Corp. v. Donaldson, 325 U.S. 304, 314 (1945), and their underlying rationale is "to encourage promptness in the bringing of actions, that the parties shall not suffer by loss of evidence from death or disappearance of witnesses, destruction of documents or failure of memory." Missouri, Kansas & Texas R. Co. v. Harriman, 227 U.S. 657, 672 (1913). Such statutes "are founded upon the general experience of mankind that claims, which are valid, are not usually allowed to remain neglected," Riddlesbarger v. Hartford Insurance Co., 7 Wall. 386, 390 (1869), they "promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared," Order of Railroad Telegraphers v. Railway Express Agency, 321 U.S. 342, 348_349 (1944), and they "are primarily designed to assure fairness to defendants. . . . Courts ought to be relieved of the burden of trying stale claims when a plaintiff has slept on his rights." Burnett v. New York Central R. Co., 380 U.S. 424, 428 (1965). As in the criminal law area, such statutes represent a legislative judgment about the balance of equities in a situation involving the tardy assertion of otherwise valid rights: "The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them." Order of Railroad Telegraphers v. Railway Express Agency, supra, at 349.

At page 324-25 immediately below, the Marion Court went on to set forth the operable **due process** test regarding when it is, if ever, that an indictment ought to be dismissed on account of the government's undue delay, keeping in mind that the Court had already determined that the applicable limitations period - wholly absent here, but, in federal parlance being five years, see 18 U.S.C. s. 3282 - gives rise to an irrebutable presumption of prejudice once the time line is exceeded. Clearly therefore, the

below deals then with pre-indictment delay which does not exceed the applicable limitations period. In other words, while the United States Supreme Court has ruled out speedy trial protections for pre-indictment delay - here not applicable, at least not yet - in Bar Discipline cases, it has done so only because of the existence of the applicable Statute of Limitations as above. However, the Court goes on to hold as below that due process may still inform that the indictment itself was unconstitutional if certain conditions are met, namely:

Since appellees rely only on potential prejudice and the passage of time between the alleged crime and the indictment, see Part IV, infra, we perhaps need go no further to dispose of this case, for the indictment was the first official act designating appellees as accused individuals and that event occurred within the statute of limitations. n15 Nevertheless, since a criminal trial is the likely consequence of our judgment and since appellees may claim actual prejudice to their defense, it is appropriate to note here that the statute of limitations does not fully define the appellees' rights with respect to the events occurring prior to indictment. **Thus, the Government concedes that the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellees' rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused.** [bolding added] n16 Cf. Brady v. Maryland, 373 U.S. 83 (1963); Napue v. Illinois, 360 U.S. 264 (1959). However, we need not, and could not now, determine when and in what circumstances actual prejudice resulting from pre-accusation delays requires the dismissal of the prosecution. n17 Actual prejudice to the defense of a criminal case may result from the shortest and most necessary delay; and no one suggests that every delay-caused detriment to a defendant's case should abort a criminal prosecution. n18 To accommodate the sound administration of justice to the rights of the defendant to a fair trial will necessarily involve a delicate judgment based on the circumstances of each case. It would be unwise at this juncture to attempt to forecast our decision in such cases.

At 325-26, the Court stated:

The 38-month delay between the end of the scheme charged in the indictment and the date the defendants were indicted did not extend beyond the period of the applicable statute of limitations here. Appellees have not, of course, been able to claim undue delay pending trial, since the indictment was brought on April 21, 1970, and dismissed on June 8, 1970. Nor have appellees adequately demonstrated that the pre-indictment delay by the Government violated the Due Process Clause. No actual prejudice to the conduct of the defense is alleged or proved, and there is no showing that the Government intentionally delayed to gain some tactical advantage over appellees or to harass them. Appellees rely solely [*326] on the real possibility of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence be lost. In light of the applicable statute of limitations, however, these possibilities are not in themselves enough to demonstrate that appellees cannot receive a fair trial and to therefore justify the dismissal of the indictment. Events of the trial may demonstrate actual prejudice, but at the present time appellees' due process claims are speculative and premature.

Barker v. Wingo, 407 U.S. 514 (1972).

Although Barker was a sixth amendment speedy trial case, the Court discussed some of the issues which overlap between sixth amendment and fourteenth amendment, Marion, supra, type due process delay concerns, those issues being the government's intentional delay for either delay or harassment, and the prejudice which may attach to any such delay. Namely at 531 the Court held that:

Closely related to length of delay is the reason the government assigns to justify the delay. Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. n32 A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

Page 73 of  77

n32 We have indicated on previous occasions that it is improper for the prosecution intentionally to delay "to gain some tactical advantage over [defendants] or to harass them." United States v. Marion, 404 U.S. 307, 325 (1971). See Pollard v. United States, 352 U.S. 354, 361 (1957).

The Barker Court at 532-33, also discussed some of the speedy trial prejudice factors, which logically at least overlap some of the same practical prejudice concerns found in the due process pre-indictment delay test above note in Marion. Namely:

A fourth factor is prejudice to the defendant. ... Finally, even if an accused is not incarcerated prior to trial, he is still disadvantaged by restraints on his liberty and by living under a cloud of anxiety, suspicion, and often hostility. See cases cited in n. 33, supra.

Here, the very two cases (Nutile and Jaraki) which are really at issue here were both publicized. Nutile in the Massachusetts Appeals Court reports and Jaraki in the then new Reports of Superior Court decisions. In it, Cobb's ethical mores were questioned as it was stated that the case had been referred to the BBO. Now, that was in Fall, 1995. A full five and one-half years then went by before the indictment came down. During this period, Cobb was time and again tagged as "having accused a sitting federal judge of criminal conspiracy" without any way whatsoever of forcing closure of the issue to clear his name and to point out the obvious, that the First Amendment protected that statement - like it or not - to the extent that it was *prima facie* and relevant, which it was. Judging how others think of you is very difficult,

Page 74 of  77

and perhaps it's one of those situations wherein you know how it feels when you are the one ridiculed.

Every day for those five and one-half years that the Jaraki Opinion had been published as such with it being known that the BBO was to have its mitts involved, Cobb suffered the following and similar thoughts and worries: "Well, they have never timely dismissed this matter as they have all other routine matters concerning me before the BBO, so maybe they are going to file charges **verses** "Well, if they have not done something by now, it must not be too terribly important".

Of course, both of these positions are logical, yet they are irreconcilable and nerve racking. In at least a handful of cases I was involved in this statement was thrown in my face to discredit me and derivatively, my then clients. So its was highly prejudicial for the BBO to well know for 5 1/2 years the public suspicion created by Judge McHugh's "report" to the BBO and by the Sosman matter also published, yet it stood pat ostensibly "due to the press of other business". No constitutionally competent adjudicatory system could ever allow for this excuse less delay to occur.

Lastly, as to the OBC / BBO's intent to delay for advantage, Rabe, who is involved in the present case has continued to pocket a case brought by a disgruntled ex-client of Cobb's, for acts occurring *in late 1992.* <u>The case still remains a threat to Cobb's Liberty and property rights now some twelve years later</u>. The Client made some unintelligible claim in 1998 to the BBO, which simply was a paragraph or so long letter to Cobb asking for Cobb's payment of

Page 75 of 77

a One Dollar settlement in a so called "malpractice" case. The letter was "cc'ed" to the BBO, which commanded that Cobb respond, which he did. The facts supporting the claim occurred at least six years prior **to that point** in time, when the client had fired Cobb for his protestations regarding the client's continuing refusal to stop filing stealth like **pro se** papers in the federal court while Cobb was attempting at least to represent her.

The pendency of this claim was actually discussed between Cobb and Rabe in or around 1998, Rabe then telling Cobb that a formal charge might still be brought on the claim. That's been six more years now, and the claim is still pending. Essentially, it was an ex-client, one Pakezigi, who sued Cobb in Middlesex Superior Court for "malpractice". Cobb immediately propounded discovery to her asking the basis of her claims, together with an "Offer of Judgment" for One Dollar, which Offer was promptly accepted. Beyond that, Cobb had no clue then as now what supposed negligence the claim was premised upon.

On these facts, it cannot plausibly be denied that OBC / BBO have not intentionally delayed the case. Bar Counsel certainly admitted as much six years ago, and time does not lie in any event. There is nothing whatsoever presently, or three years from now for that matter, preventing Bar Counsel from again indicting on this case whenever it wants to, **the case clearly being saved as a back up to this prosecution.** It is of a huge advantage to the OBC to use FRE 404(a) barred evidence routinely to attain convictions, and this is why thay stack cases for years until enough of them pile up so it can then charge an un-indicted "pattern".

**Last Procedural Due Process Argument** -

**Vindictiveness** in sentencing is the reward for those lawyers who have the guts - or, rather, the misfortune, to have no choice but to vigorously defend false and defamatory charges at the BBO, particularly when, like Cobb, they accurately point out just how absurd the state's "theft" charge was, and the same is unconstitutional under Alabama v. Smith, 490 U.S. 794 (1989) and North Carolina v. Pearce , 395 U.S. 711 (1969). Cobb was said to have "not appreciated" his conduct as evidenced by his agressive stance at the BBO.

When you do this to a man, he will fight for what is his, if he is truly a man.

Respectfully submitted,

Matthew Cobb
Law Office of Matthew Cobb
101 Tremont Street
Boston, Massachusetts   02108
(617) 357-7300

Verification - I, Matthew Cobb, under pains and penalties swear that the Facts set forth above are true to the best of my knowledge and personal observation. I cannot attest to the above Opinions, nor some of the stated inferences or arguments. But the facts described I stand by so help me God. This last day of April, 2004.

_____
Matthew Cobb

Page 77 of  77

Case 1:04-cv-10390-MLW    Document 9-4    Filed 04/30/2004    Page 19 of 25

JANE DOE & another[1] vs. NUTTER, McCLENNEN & FISH
& another.[2]

No. 95-P-1341.

Suffolk. May 10, 1996. – August 16, 1996.

Present: SMITH, PORADA, & IRELAND, JJ.



*Privileged Communication. Attorney at Law,* Canons of ethics, Signing of
pleadings and other court papers. *Appeals Court,* Appeal from order of
single justice. *Practice, Civil,* Frivolous action. *Rules of Appellate Proce-
dure. Rules of Civil Procedure.*

A letter from an attorney, responding to a G. L. c. 93A demand letter and
stating that the demand letter was defamatory, was absolutely privileged
as a communication by an attorney preliminary to the initiation of a
legal proceeding (the threatened c. 93A litigation), and claims for viola-
tion of G. L. c. 93A, violation of the Massachusetts Civil Rights Act,
invasion of privacy and intentional infliction of emotional distress based
on the attorney's response were properly dismissed. [140-141]

S.J.C. Rule 3:07, Canon 7, DR 7-104, does not create an independent cause
of action with respect to any alleged violation thereof. [141]

A Superior Court judge did not err in awarding counsel fees to defendants
under Mass.R.Civ.P. 11 for plaintiffs' attorney's bad faith pursuit of
meritless claims. [141-143]

A single justice did not abuse his discretion in imposing sanctions for
plaintiffs' counsel's insertion of scandalous and impertinent material in a
petition under G. L. c. 231, § 118, first par. [143-144]

This court concluded that an appeal from a civil judgment and from orders
of a motion judge and a single justice assessing sanctions was frivolous
and accordingly awarded double costs against plaintiffs' counsel. [144]

CIVIL ACTION commenced in the Superior Court Depart-
ment on December 17, 1993.

Motions to dismiss and for sanctions under Mass. R. Civ.
P. 11 were heard by *Martha B. Sosman,* J.

After a proceeding for interlocutory appeal was heard in

---

[1]Richard Doe.

[2]Alan Rose.

Exhibit C

the Appeals Court by *Laurence*, J., a motion for entry of separate and final judgment was heard by *Herman J. Smith, Jr.*, J.

*Matthew Cobb* for Jane Doe.

*Joseph G. Blute* (*Glenn E. Deegan* with him) for the defendants.

PORADA, J. After a separate and final judgment was entered in the Superior Court dismissing plaintiffs' claims against the defendant law firm, Nutter, McClennen & Fish (NMF), and one of its partners, Attorney Alan Rose, for violation of G. L. c. 93A, violation of the Massachusetts Civil Rights Act, invasion of privacy, and intentional infliction of emotional distress, the plaintiffs filed this appeal. The plaintiffs' claims arose out of a response by the defendant Rose on behalf of a client, South Shore Neurology Associates, Inc. (South Shore), to a thirty-day G. L. c. 93A demand letter that the plaintiffs' counsel had sent to South Shore. The plaintiffs argue that the motion judge erred in (1) dismissing their claims on the ground that they were barred by the absolute privilege which attaches to communications by an attorney preliminary to the initiation of legal proceedings; and (2) in imposing sanctions under Mass.R.Civ.P. 11, 365 Mass. 753 (1974), upon plaintiffs' counsel for filing this action against NMF and Rose. The plaintiffs also argue that a single justice of this court erred in imposing sanctions upon their counsel. We affirm and award double costs against plaintiffs' counsel based on the frivolous nature of this appeal.

We summarize the pertinent undisputed facts from the record. On February 1, 1992, the plaintiffs' attorney sent a thirty-day demand letter pursuant to G. L. c. 93A to South Shore. In that letter, plaintiffs' counsel alleged that his client had been sexually assaulted during a physical examination performed at South Shore's offices and that if South Shore did not respond with a reasonable offer of settlement, an action would commence. On March 27, 1992, Rose responded to the demand letter on behalf of South Shore. In his written response to plaintiffs' counsel, he denied that an assault had taken place and stated at the end of the letter that "[y]our February 1, 1992 letter is defamatory. [The doctor] and South Shore have excellent reputations, and both fully believe that your client's conduct in accusing [the doctor] of sexual and professional misconduct is actionable." Rose also sent a copy of this letter to the plaintiff, Jane Doe.

In November, 1992, the plaintiffs filed a complaint in the Superior Court against the defendants named in this proceeding. At about the same time, the plaintiffs served the defendant Rose with a thirty-day demand letter under G. L. c. 93A claiming that the mailing of a copy of South Shore's response directly to the plaintiff was a violation of the canons of ethics and subjected the defendants to civil liability. In this letter, plaintiffs' counsel referred to South Shore and the doctor as "NMF and Rose's (former?) clients." In response to the filing of the complaint, a copy of which had been mailed to the defendants but not served upon them, NMF and Rose replied that any action against them was barred on several grounds, including an absolute privilege relating to statements made by an attorney relative to proposed litigation, and cited applicable case law on the subject. This action was subsequently dismissed for failure of the plaintiffs to serve the defendants.

In December, 1993, the plaintiffs filed their complaint in this action in the Superior Court. This complaint contained the very same claims as the first complaint which had been dismissed for lack of prosecution. Rose and NMF filed a motion to dismiss based on several grounds, including the ground that the claims asserted were barred by the absolute privilege which attaches to communications by an attorney preliminary to the initiation of a legal proceeding. They also filed a motion requesting counsel fees under G. L. c. 231, § 6F, Mass. R.Civ.P. 11, and the inherent power of the court. The judge dismissed the plaintiffs' complaint on the grounds that the contents of the letter or the mailing of the letter to Jane Doe did not give rise to civil liability against the defendants. The judge stated that she would allow the motion for attorneys' fees against plaintiffs' counsel under rule 11 but not under G. L. c. 231, § 6F.[3] After hearing the parties and reviewing the affidavit submitted for attorneys' fees and costs by counsel for NMF and Rose, the judge awarded NMF and Rose $4,000 in attorneys' fees. The award was based on her findings that plaintiffs' counsel was aware before filing suit that he did not have a viable cause of action against the defendants and that his actions were prompted by a desire to deprive South Shore of its chosen counsel.

Pursuant to G. L. c. 231, § 118, par. 1, the plaintiffs ap-

[3] The motion judge opined that G. L. c. 231, § 6F, applied only to "parties," and not their attorneys.

pealed the dismissal of their claims and the award of counsel fees to the single justice of the Appeals Court. Finding that the Superior Court judge did not abuse her discretion or commit an error of law, the single justice dismissed the petition but imposed sanctions[4] under Mass.R.A.P. 25, as amended, 378 Mass. 925 (1979), against plaintiffs' counsel for his scandalous and impertinent remarks in which he accused the Superior Court judge of bias, unethical conduct, and inappropriate susceptibility to influence by NMF and Rose. A Superior Court judge allowed entry of a separate and final judgment in favor of NMF and Rose. The plaintiffs then filed this appeal. We now address the merits.

1. *Dismissal of plaintiffs' claims.* The plaintiffs argue that Rose's response to their thirty-day demand letter to South Shore was actionable because his threat to bring a law suit against plaintiff Jane Doe did not relate to a legal proceeding which was contemplated in good faith and which was under serious consideration. *Sriberg v. Raymond,* 370 Mass. 105, 108-109 (1976). The plaintiffs base their argument on the grounds that their accusation of misconduct against South Shore and the doctor was contained in the privileged thirty-day demand letter, see *Theran v. Rokoff,* 413 Mass. 590 (1992), and consequently any threat by the defendants to sue based on that letter could not have been made in good faith or been the subject of serious consideration.

The plaintiffs, however, misconstrue the privilege which attaches to statements made by an attorney "in the institution or conduct of litigation or in conferences and other communications preliminary to litigation." *Sriberg v. Raymond,* 370 Mass. at 109. The privilege is absolute. *Theran v. Rokoff,* 413 Mass. at 591-592. *Robert L. Sullivan, D.D.S., P.C. v. Birmingham,* 11 Mass. App. Ct. 359, 361 (1981). An absolute privilege provides a complete defense even if the offensive statements are uttered maliciously or in bad faith. *Correllas v. Viveiros,* 410 Mass. 314, 319 (1991). *Mulgrew v. Taunton,* 410 Mass. 631, 634 (1991). In addition, the absolute privilege which attaches to those statements protects the maker from any civil liability based thereon. *Correlas v. Viveiros,* 410 Mass. at 324. *Robert L. Sullivan, D.D.S., P. C. v. Birmingham,* 11 Mass. App. Ct. at 367-368. See *Frazier v. Bailey,* 957

[4]The sanctions consisted of an award of attorney's fees in the sum of $3,244.50.

F.2d 920, 932 (1st Cir. 1992)(claims for negligence, defamation, intentional infliction of emotional distress, and violation of Massachusetts Civil Rights Act based on communications preliminary to litigation and during pendency of litigation were entitled to absolute immunity from civil liability under Massachusetts law). To rule otherwise would make the privilege valueless if an individual would then be subject to liability under a different theory. *Correlas v. Viveiros,* 410 Mass. at 324. *Robert L. Sullivan, D.D.S., P. C. v. Birmingham,* 11 Mass. App. Ct. at 367-368.

Here, there is no question that Rose's letter was in response to the plaintiffs' demand letter under G.L. c. 93A preliminary to litigation threatened by the plaintiffs. Accordingly, plaintiffs' claims, all of which originate from that response, were properly dismissed.

To the extent that any of the plaintiffs' claims were based on Rose's mailing a copy of the response directly to Jane Doe, which plaintiffs allege constitutes a violation of S.J.C. Rule 3:07, Canon 7, DR 7-104, 382 Mass. 786 (1981),[5] we conclude that they were also properly dismissed. Assuming without deciding that this conduct did violate the rule, the violation would not give rise to a cause of action against Rose and NMF. The disciplinary rules provide standards of professional conduct of attorneys and do not in and of themselves create independent causes of action. *Fishman v. Brooks,* 396 Mass. 643, 649 (1986). *Robert L. Sullivan, D.D.S., P.C. v. Birmingham,* 11 Mass. App. Ct. at 368-369.

2. *Rule 11 sanctions.* The plaintiffs argue that the motion judge erred in finding that their counsel pursued claims against NMF and Rose that he knew were "patently lacking in any even arguable merit" and that he did so "for the apparent purpose of depriving defendant . . . of its chosen counsel." Rule 11 provides, in pertinent part, that "[t]he signature of an attorney to a pleading constitutes a certificate by him that he has read the pleading; that to the best of his knowledge, information, and belief there is a good ground to

[5]Disciplinary rule 7-104 provides in pertinent part as follows: "(A) During the course of his representation of a client, a lawyer shall not: (1) communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so."

support it; and that it is not interposed for delay."[6] "Good ground" requires that the pleadings be based on "reasonable inquiry and an absence of bad faith." *Bird v. Bird*, 24 Mass. App. Ct. 362, 368 (1987). *New England Allbank for Savings v. Rouleau*, 28 Mass. App. Ct. 135, 141 (1989). *Nemeroff v. Abelson*, 620 F.2d 339, 350 (2d Cir. 1980). See also Vairo, Rule 11: A Critical Analysis, 118 F.R.D. 189, 193 (1988).

We conclude that the motion judge did not abuse her discretion in awarding sanctions against plaintiffs' counsel to NMF.[7] See *Bird v. Bird*, 24 Mass. App. Ct. at 369 (abuse of discretion standard employed in determining whether rule 11 sanctions were warranted). See also *Cooper & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990) (award of sanctions under cognate Federal rule 11 reviewed under abuse of discretion standard). Before filing the subject complaint, plaintiffs' counsel had been furnished with case law from NMF and Rose's counsel which indicated that a violation of professional canons of ethics did not give rise to a cause of action and that the absolute privilege which attaches to statements made by an attorney preliminary and pertinent to anticipated litigation immunized NMF and Rose from civil liability. Compare *Robinson v. Dean Witter Reynolds, Inc.* 129 F.R.D. 15, 21 (D. Mass. 1989) (plaintiff's counsel sanctioned under Federal rule 11 [1983] for opposing arbitration in face of clearly contrary legal authority which had been brought to his attention by opposing counsel).

In addition, the judge could properly determine that plaintiffs' counsel acted out of spite in instituting this action against NMF and Rose in an effort to remove them as South Shore's counsel in view of evidence that in his G. L. c. 93A demand letter to Rose he referred to South Shore as their "(former?) client[]," and in other correspondence stated, "I do not really care whether its NMF, F. Lee Bailey, or a kid right out of law school, NOBODY is going to do to my clients what NMF attempted and get away with it." Presented with

[6] Rule 11 is modeled after Federal rule 11 as it existed prior to its amendment in 1983. Federal rule 11 was again amended in 1993.

[7] We note that the plaintiffs did not raise as an issue whether attorney's fees may be awarded to an attorney pro se litigant under rule 11. Accordingly, we make no determination on that issue. See *Committe v. Dennis Reiner Co.*, L.P.A., 150 F.R.D. 495, 501-502 (D. Vt. 1993), for a discussion of an award of attorney's fees to pro se litigants under Federal rule 11.

this evidence, the motion judge could properly determine that plaintiffs' counsel acted in bad faith in joining Rose and NMF as party defendants in plaintiffs' litigation against South Shore and the doctor.

3. *Single justice sanctions under Mass.R.A.P. 25.* The plaintiffs argue that the single justice erred in imposing sanctions under Mass.R.A.P. 25 against their counsel based on the insertion of material in the G. L. c. 231, § 118, first par,[8] petition which accused the motion judge of bias, unethical conduct, and inappropriate susceptibility to unspecified illegitimate influence by counsel for NMF and Rose. Their argument is limited to the contention that sanctions were not warranted based on the conduct of the motion judge and the impropriety of NMF and Rose being 'represented by an attorney from their firm.'

Having reviewed the affidavit filed by plaintiffs' counsel in support of the petition for interlocutory review, we conclude that the single justice did not abuse his discretion in imposing sanctions. However, Mass.R.A.P. 25 provides that "[i]f the appellate court shall determine that an appeal is frivolous, it may award just damages and single or double costs to the appellee." Rule 1 of the Rules of Appellate Procedure defines "Appellate Court" as "the full Supreme Judicial Court, the full Appeals Court, or a statutory quorum of either, as the case may be." The rule makes no reference to a single justice of either court. Therefore, a single justice does not have the power to make such an award under Mass.R.A.P. 25 — an issue which was not raised by the plaintiffs and is, consequently, considered waived. Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). *Fifty-One Hispanic Residents of Chelsea v. School Comm. of Chelsea*, 421 Mass. 598, 604 (1996).

In any event, the single justice had the authority to make such an award under rule 11 of the Massachusetts Rules of

[8] Because the parties have not raised as an issue the timeliness of the petition filed with the single justice under G. L. c. 231, § 118, on September 29, 1994, and the state of the docket in the Superior Court is such that we are uncertain as to whether the orders were entered on August 12, 1994 (the date of entry shown on the docket), or on August 30, 1994 (the date shown on the docket as the date of notice to the parties), we assume that the single justice treated August 30, 1994, as the actual date of entry of orders and thus had jurisdiction to act in this matter. G. L. c. 231, § 118. Mass.R.Civ.P. 77(d), 365 Mass. 838 (1974).

Doe *v.* Nutter, McClennen & Fish.

Civil Procedure, which allows sanctions for the inclusion of "scandalous and impertinent" material in a pleading and which has been made applicable to single justice proceedings by Mass.R.Civ.P. 1, 365 Mass. 730 (1974). *Callahan* v. *Board of Bar Overseers*, 417 Mass. 516, 519 (1994).

Accordingly, we affirm the judgment dismissing the complaint and the orders of the motion judge and single justice assessing sanctions against plaintiffs' counsel. We also consider this appeal frivolous and award double costs against the plaintiffs' counsel.

*So ordered.*

IMPOUNDED

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS:                                 SUPERIOR COURT
                                             CIVIL ACTION
                                             NO:   93-07134-F

JEAN NUTILE,

Plaintiff

vs.

NUTTER, McCLENNEN & FISH, ALAN D.
ROSE, SOUTH SHORE NEUROLOGY
ASSOCIATES, INC., AND MICHAEL T. HAYES,
M.D.,

Defendants



ORDERS

1.    The Court allows the Motion For Entry of Separate and Final
Judgment filed by defendants Nutter, McClennen & Fish (hereinafter "NMF") and
Alan D. Rose (hereinafter "Rose"). In light of the dismissal of all of the plaintiff's
claims against defendants NMF and Rose and in light of the motion session judge's
finding that the claims were frivolous, which finding was affirmed by the Appeals
Court, this court finds that there is no just reason for delay in the entry of separate
and final judgment.

2.    NMF's and Rose's Motion For an Order Striking the Names of
NMF and Rose From the Caption is allowed.

3.    The plaintiff has not paid either the sanction of $4,000 in attorney's
fees (to be paid by plaintiff's attorney), ordered by Judge Sosman in her August 12,
1994 Order or the additional sanction of $3,244.50 in attorney's fees ordered by the
Appeals Court in its November 21, 1994 Order. This Court hereby Orders plaintiff's

Exhibit D

– 2 –                                                      93-07134-F

...er,
... Fish, Alan D.
...uth Shore Neurology
...ssociates, Inc., and Michael
T. Hayes, M.D.

attorney, Matthew Cobb, to pay, pursuant to Judge Sosman's August 12, 1994

Order, the $4,000 sanction plus interest to defendants NMF and Rose by May 31,

1995. In addition, the Court hereby Orders the plaintiff to pay, pursuant to the

Single Justice's November 21, 1994 Order, the $3,244.50 sanction plus interest to

defendants NMF and Rose by May 31, 1995.

    4.    The plaintiff's Motion For A Stay of the Attorney's Fee Award is

denied.

DATED:    April 28, 1995           SO ORDERED.

                                  Herman J. Smith, Jr.
                                  Justice of the Superior Court

c:\w4w\superior.ct\suffolk\cv93\cv07134a.doc