UNITED STATES COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Matthew Cobb,<br><br>Plaintiff,<br><br>vs.<br><br>Honorable Margaret H. Marshall, et al.,<br><br>Defendants. | CIVIL ACTION<br><br>04 10390 MLW |

PLAINTIFF'S BRIEF IN SUPPORT OF
RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER

**Procedural Update**

On the afternoon of May 5, 2004, this Court held a lengthy hearing in this matter. The Court then issued a Ruling staying this action until the Single Justice of the Massachusetts Supreme Judicial Court (SJC) had Ruled in Cobb's bar discipline matter pending before the SJC. A copy of this Court's Order of May 5, 2004 is attached hereto as Exhibit "A". The Single Justice ruled on August 2, 2004, and disbarment, effective September 1, 2004, is his order. See Exhibit "B".

Pursuant to this Court's Order of May 5, counsel herein must (by August 16th) have conferred and filed a proposed schedule for the resolution of the plaintiff's motion for preliminary injunction and the defendants' motion to dismiss. Presently, this conference has not yet occurred. Cobb is working on a draft schedule, which he will have transmitted to counsel by Tuesday

Morning, August 10.

**The May 5, 2004 Hearing in this matter.**

At this Court's above hearing, Cobb had argued for a TRO to then issue barring the Single Justice hearing then set for the following day. As respects the central issue of maintaining the *status quo*, the TRO had two independent grounds.

First was that it could hardly be contested that disbarment in itself constituted irreparable injury. The equity achieved therefore in preserving the *status quo* temporarily whist the parties prepared for a (most likely) consolidated trial on the merits / hearing on preliminary injunction weighed heavily in Plaintiff's favor. This much has not changed and, as this Court at least tangentially noted at the hearing, the state's claim that it needs to discipline a lawyer, now, must be viewed in the context of upwards of eight years of state sanctioned delays.

Secondly, was that if the Single Justice hearing were not enjoined, the state was then sure to argue - post Single Justice Order - that this Court would be violating the Rooker-Feldman Abstention Doctrine should it then interfere with Cobb's ongoing state court proceedings. Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923) and District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983). And while the plaintiff certainly does not take the position that any such argument would have had merit, it

was enough that the state would assuredly make it.

Once this Court was adequately informed at the said May 5th hearing of this (second) reason for so preserving the *status quo*, discussions between the Court and counsel for the defendants then ensued relative to whether said defendants would in fact take such a legal position post Single Justice Ruling or not. Counsel for the defendants clearly represented to the Court that defendants would not so argue Rooker-Feldman as respects the Single Justice's Order.

As it turns out - and wholly independent of the above waiver by the state defendants - Rooker-Feldman on its substance has no application whatsoever to the recent Single Justice's Order anyway. Exhibit "B". This is because we do not in the least need to here review the same in order to "overrule" it nor decide legal /factual issues in a way different than did Justice Greaney. Rather, it is for what the Opinion in itself undisputedly informs as to the central issues regarding the First and Fourteenth Amendments to the U.S. Constitution in the case, which presently weigh heavily into preserving the status quo.

Namely: (1) that Cobb is being severely punished by the state **for the content** of what he said relative to the *prima facie* actions of two judges some ten years ago which actions threatened the fair administration of Justice; (2) that the factual basis for the state's sole justification for disbarment, theft -

despite the State's second seemingly clear May 5th promise to the Court that the Single Justice would address all of Cobb's arguments made before the federal court - was only addressed partially and in a wholly conclusory fashion which avoided any discussion of the State's dearth of specific evidence on the "actual deprivation" element of "conversion".

There are a host of other issues to be dealt with relative to the preliminary injunction, but these two are so grave, and it is so obvious that the prosecution relied heavily on these two, that in themselves they are enough to presently Vacate the said Single Justice Order until this Court passes ultimate judgment at the preliminary injunction.

**The government has again failed to explain except in conclusory fashion how it was that Cobb could have possibly wrongfully deprived his client of funds, even temporarily, when it is undisputed that his client's obligation to pay money preceded in time by eight months any actual receipt by Cobb from the said client of monies which he was to pay over to another on client's behalf.**

Unless and until the government establishes that Cobb possessed client funds "wrongfully", namely, at a time that the client was not already obligated to pay, we do not even get to the rest of the "conversion" elements. ("One who intentionally or wrongfully exercises acts of ownership, control or dominion over personal property to which he has no right of possession at the time is liable for the tort of conversion." See generally Nolan, Tort Law § 35 (1979).

It has never been contested that the theory of the prosecution as specifically plead in the indictment was clearly that the Massachusetts Appeals Court had "Affirmed" an Order of a Single Justice which directed Cobb, and not his client, to pay a roughly $3,200.00 sanction, and that he never did so. At the hearings before the BBO, Cobb showed undisputedly that there was no such "order" of the Single Justice directing him to pay, so it could not be "Affirmed", and that there was yet still another Order against saying to make the exact same payments. See Cobb's Brief in support of preliminary injunction, pp. 27-34. So, after the close of the evidence before the BBO, and after Cobb had successfully completely debunked the indicted theory, both Bar Counsel and the Board adopted a new, unindicted theory, namely, that the Full Panel "Affirmance" as alleged was now somehow a "modification" of - without even using such words or even referencing - a trial court order directing that his clients pay the funds. This theory of course also was without factual basis.

Now, given the Single Justice's Opinion of August 2, 2004, another, third, un-indicted theory of conversion is being pursued. This new theory of conversion as best as can be determined is apparently that Cobb can now be guilty of holding client funds that he received some eight months after the client's obligation to pay accrued "wrongfully" at a time wherein it remains undisputed that Cobb then promptly paid over the said

funds to the party owed as directed by Court Order.

Sooner or later this continued re-formulation of the prosecution's wholly un-indicted theory of the case must stop because no reasonable man could possibly defend such a moving target. See In Re Ruffalo, 390 U.S. 544 (1968). Cobb reasonably defended the indicted charge as having no basis in fact. He showed that the supposed order which such charge was based upon did not exist and in fact the Court ordered not once but twice exactly the opposite.

Now it appears that such never amended indicted charge has been wholly abandoned and a quite novel theory of conversion is now being pursued. No person could reasonably anticipate that after proving conclusively at a hearing that there was no point in time ever that he held even a penny of the client's money prior to the client's obligation to pay a court ordered sanction which was precisely what was indicted, that he would later be faced with a most novel unindicted "conversion" claim. Namely, that if a client undisputedly owes $3,200.00 on day one which his lawyer is to disburse, then, some eight months later finally sends over $2,000.00 of that amount towards payment and then the lawyer digs into his own pocket to cover the deficit still owed to make the timely disbursement pursuant to court order, that this is somehow "conversion". As best as can be understood from Exhibit "B" is that if six years after all payments were

unequivocally made pursuant to court order the client thinks that the money he sent to lawyer was for something else, then lawyer has "converted" temporarily those funds. This theory cannot find basis in the law of conversion, and it was certainly not even close to what was alleged in the indictment. No man could possibly defend such a moving target. Exhibit "B" pp. 6-7.

**The government has finally admitted the obvious, that it seeks to punish the very content of Cobb's prima facie speech, yet for the eleventh straight calender year it has not said how such speech ever posed a clear and present danger to the administration of justice.**

It is clear that Cobb is being punished for the content of what he said about the judges. See Exhibit "B", pp. 22. As such, the government must have evidence that his words presented a "clear and present danger" to the administration of justice. Bridges v. California, 314 U.S. 252 (1941). The BBO record contains nothing of the sort. Rather, as was precisely criticized by the U.S. Supreme Court in both Schaware and Gentile, *infra*, the Board simply stated facts (i.e., the content of what was said by the lawyer) then summarily concluded that the same posed a threat to Justice without more. Thankfully, the Honorable Justice Greaney's Opinion itself now finally confirms that which seemed always clear, namely, that Cobb's words reflected competently reported (evidence wise) acts of misconduct in the courts.

With respect to Judge Sosman, the Opinion itself, Exhibit "B" at p. 13, acknowledges what Cobb has said all along. This was

that Attorney Blute was there violating (old) DR 5-103 by representing his equity Law Firm Partner, Rose, a defendant, at the hearing. What more is there?

It is undisputed that Cobb had simply argued to the Single Justice (Lawrence) of the Appeals Court in August 1994 that Judge Sosman's conduct - in throwing out the case as against Attorney Rose and his firm, Nutter, and then sanctioning Cobb personally for $4,000.00 after knowingly allowing and encouraging such misconduct on the still preserved record in open court - permitted a reasonable inference of bias and/or potential influence. In the ten years following this act, Cobb never again made such an accusation because, of the next several hundred or so judges he was before, he never again observed a judge knowingly allow and encourage such an undisputed disciplinary rule in open court.

Justice Greaney's Opinion in fact draws upon the Judge's clear knowledge of this violation. Exhibit "B", p. 13, FN 3. It should be also noted that Cobb's reference to "I haven't made a complaint about that" was responding to an inquiry by Judge Sosman as to whether Cobb had made *a BBO complaint* about Mr. Rose's conduct of unethically contacting his then client after he knew Cobb represented her. Cobb was certainly then objecting to Blute's unethical practice before the Judge, as he had raised and there argued the issue as "a violation".

It is beyond purview - and has never been remotely contested by the state in ten years - that Judge Sosman's own Judicial Code of Conduct not only barred her from encouraging unethical conduct

no matter the costs nor efforts supposedly saved thereby, but also required her to report or otherwise take action regarding such unethical misconduct which she became aware of. Neither the ethical violation of Blute, nor the Judge's own obligation to take action thereon, evaporated simply because the judge felt it expedient to ignore it as was clearly and unfortunately intimated in Justice Greaney's Opinion. Exhibit "B", at p. 13. When we teach the law of ethics, and make violations of the same disbarable, we should stick by it, otherwise lawyers who believe under clear safe harbor that they are doing the right - albeit difficult - thing will be disbarred for having insulted the integrity of a judge who was not following the rules.

Secondly as to Judge Sosman, Cobb was prevented by the BBO from calling her to the stand under a BBO ruling which stated that what mattered in so far as Cobb's argument that she was biased was what was objectively knowable at the time, Judge Sosman's knowledge being "irrelevant". Exhibit "C". Yet, the Court itself in disbarring now uses this exact knowledge of Judge Sosman to rationalize that it was somehow alright for her to ignore the disciplinary rules. Exhibit "B" p. 13. So, the knowledge was irrelevant and barred when Cobb needed to cross examine the Judge under oath as to why she did what she did, yet, the exact same "irrelevant" knowledge is now being used to disbar Cobb?

As respects the *ex parte* judge swap manifestly made without Judge Sosman having ever disclosed the same to Cobb, Cobb was also deprived of course of inquiring of her about the same. Yet,

he is now penalized for not having evidence that an improper *ex parte* communication occurred, which the Court emphasizes by quoting the testimony of Mr. Blute in this regard. Exhibit "B" at p. 11.

It is quite remarkable how it is that Mr. Blute "went up to superior court" and, speaking in present terms stated that Judge Barrett then "recused himself", when the BBO record evidenced copies of documents obviously drafted at the Nutter offices with Judge Sosman's name on them which were directed to Judge Sosman's session clearly preceding him going "up to the superior court". It is also of course quite curious how it is that Blute knew of this switch (and he did not deny that he so informed Cobb personally a second or two before the gavel dropped at the hearing) unless he had not spoken with the court about it. So Cobb could not cross examine Judge Sosman on this point either which would be to simply have her tell how it was that she took the case, and with whom did she so arrange to do so? Cobb was moreover certainly entitled to cross examine Judge Sosman on whether her application to the Bench roughly a year prior to that time had been approved by a committee which Mr. Rose himself had vice chaired. If this fact in and of itself was not required to be disclosed by a Judge who was then and there throwing out the case against Rose then rewarding him with sanctions with him right there in the courtroom, then when that fact is combined with the fact that no court officer apart from Mr. Blute (at the very last second, well after Judge Sosman had the case) at any time ever informed Cobb of the session switch, then such

disclosure ought to have ben made. If there was a discussion with the Court as to Judge Barrett not taking the case, then Cobb should have been involved, as he would not likely Object to a Judge who had worked with a particular lawyer when "sanctions" were on deck since that Judge would certainly have gone out of his way to appear fair, something unfortunately which did not then occur with Judge Sosman.

Given the above, Cobb was prevented in establishing facts material to his defense relative to Judge Sosman, and the same is unconstitutional under Connecticut v. Doe, 538 U.S. 1,7 (2003).

As to the second instance of reporting misconduct in the court, it is undisputed that the Judge (Gertner) in question was clearly not performing a *judicial act* when, as reported by a witness, she had privately spoken with that witness (who was a prior client of hers), which witness then told Cobb's client that he had agreed to "forget" his testimony based on that and another conversation should he be called to the stand as previously contemplated. What is and has always been at issue was whether making the report was protected conduct under either the First Amendment or under a Massachusetts Lawyer's (safe harbor) Oath [1].

What has never been an issue of course is whether almost seven years later the persons in question might deny having

---

1 I (repeat the name) solemnly swear that **I will do no falsehood, nor consent to the doing of any in court;** I will not wittingly or willingly promote or sue any false, groundless or unlawful suit, nor give aid or consent to the same; I will delay no man for lucre or malice; but I will conduct myself in the office of an attorney within the courts according to the best of my knowledge and discretion, **and with all good fidelity as well to the courts as my clients. So help me God.** (relevant bolding added by the Relator).

aided a witness in his plan to not testify truthfully under oath. Judge Gertner's testimony has never been relevant to this nor the BBO case since what was reported was *prima facie* and therefore reportable to the Court whether or not later denials were made.

The said witness had already detailed to both Cobb and client the material information which he now would "forget". The mere fact that Judge Gertner was a judge cannot be used to punish Cobb when she was not acting in any judicial capacity. Since the Court has alluded again to the fact that she was a judge, Exhibit "B", p. 22, and we all know that whatever her actions were reported to be that they were not judicial, then what is happening here is that the judge - simply because she is a judge and for no other conceivable reason - is being given unconstitutionally preferred reputational status under Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 838 (1978) for criticisms as against her so as to rationalize Cobb's punishment therefore, which violates the First Amendment. Please see discussion in pp. 41 - 50 of Plaintiff's previously filed Brief in support of TRO. The State cannot credibly deny that this specific charge of "accusing a sitting federal judge" was time and again emphasized throughout these proceedings as a grave wrong, it has been all over Boston publically for years, and its inclusion therefore as a reason to punish - not unlike the false claim of theft - forever poisoned the outcome of the matter.

Secondly, as respects the instance regarding Judge Gertner, the very lawyer's Oath in Massachusetts as above - let alone the First Amendment - allows for such reporting. Cobb's Oath to do

nor consent to the doing of any falsehood in the court and to otherwise require strict fidelity does not go on to say "unless a judge later shall determine that he in his discretion will not admit the reported evidence of such falsity because it is improbable". Please see Exhibit "B" at p. 5 wherein Justice Greaney explains that this statement was "discredited hearsay". For any evidence to have ever been discredited, it must first have been considered, and that was enough under the First Amendment, Landmark, and under the said Oath. The fact is that as unsavory as this all was, it was a reportable event because even the SJC now says that it was *prima facie*. Whether it is denied later is immaterial to the reporting requirement as the unqualified Oath so infers. The Oath as it must be is set forth in an unqualified way. Moreover, the report that the witness had so changed his testimony upon such urging was relevant to Cobb's state of mind in reporting the situation to the Court as an Officer of the Court acting under such dictate. Under the Oath itself, there could hardly be evidence more germane to whether a falsehood was being perpetrated upon the Court than what the lawyer clearly understood (his state of mind in so reporting) through the said report to be such a falsity. The report was therefore protected by safe harbor under Gentile v. State Bar of Nevada, 501 U.S. 1030, 1048-49 (1991)(Majority Opinion by Mr. Chief Justice Rehnquist).

**Conclusion**

There can be no doubt that the several protected through

quite unpopular Judge reports by Cobb, together with the "theft" which never happened, weighed heavily on the decision to disbar Cobb. The State has admitted all along that the only disbarable offense was theft. It mixed a capital charge with non-capital charges, and completely changed the theory of that charge twice after the evidence closed.

This impending disbarment (effective September 1, 2004) is unjust and the exclusive basis for the same was arrived at without affording Cobb both substantive and procedural due process. The Single Justice's decision and that of the BBO were both hopelessly prejudiced by the inclusion of the above. Cobb can easily defend at a full hearing some of the other charges under the First Amendment, like disciplining him for an taking a legal position that one judge approves, and the other believes frivolous. Schware v. Board of Bar Examiners of New Mexico, 353 U.S. 232 (1957)(concurrence, unconstitutional to punish lawyer when reasonably minded judges disagree as to the merits of the legal position he took).

LoRo 701 / attorney K.H, esq.
I informed by leaving a message w/ his office this day.
MC

Respectfully submitted,

Matthew Cobb
101 Tremont Street
Boston, Massachusetts 02108
(617) 357-7300

Served via US mail, fax & email this Aug. 9, '04
By Matt Cobb