UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MATTHEW COBB,                    )
    Plaintiff,              )
                    )
         v.               )    C.A. No. 04-10390-MLW
                    )
SUPREME JUDICIAL COURT   )
OF MASSACHUSETTS, ET AL.,)
    Defendants.             )

MEMORANDUM AND ORDER

WOLF, D.J.                                         August 31, 2004

I.    INTRODUCTION

Matthew Cobb, a Massachusetts attorney proceeding pro se, has brought this action seeking a preliminary and permanent injunction prohibiting the Supreme Judicial Court of Massachusetts (the "SJC") from disbarring him as recommended by the Massachusetts Board of Bar Overseers (the "BBO" or the "Board"). The SJC and its Justices, who are named as defendants in their official capacities, have moved to dismiss this case on the basis of Younger v. Harris, 401 U.S. 37 (1971), which requires that federal courts not intervene in ongoing state proceedings unless certain, limited circumstances justifying an exception are demonstrated.

After a hearing on May 5, 2004, the court denied Cobb's motion for a preliminary injunction that, if granted, would have prohibited a Single Justice of the SJC from hearing his case. The court deferred ruling on the defendants' motion to dismiss.

On August 2, 2004, the Single Justice issued a decision ordering that Cobb be disbarred effective September 1, 2004.

On August 27, 2004, this court held a hearing on Cobb's renewed motion for a preliminary injunction and defendants' motion to dismiss. For the reasons explained in this Memorandum, Cobb has failed to make the showing necessary to avoid dismissal pursuant to Younger. Accordingly, defendant's motion to dismiss is being allowed and Cobb's motion for preliminary injunction is, therefore, moot.

II.  PROCEDURAL HISTORY AND RELATED FACTS

In his August 2, 2004 Memorandum and Order, the Single Justice described the procedural history of this matter as follows.

> Bar counsel filed a petition for discipline against the respondent on February 12, 2001, charging professional misconduct in three separate counts, each count pertaining to misconduct arising in the course of the respondent's representation of three different clients. A condensed overview of the charges is as follows. Count one arose from the respondent's representation of Dr. Omar Jaraki and alleged that the respondent filed a motion containing improbable and false allegations that he failed to corroborate, thereby exposing Dr. Jaraki to sanctions, and that the respondent made groundless representations to the court. Count two arose from the respondent's representation of Richard and Jean Nutile, a married couple, and alleged that the respondent filed a complaint against their adversaries' attorneys without grounds to support it, misrepresented to his clients that they had been sanctioned, persisted in a frivolous appeal, converted his clients' settlement proceeds to pay sanctions assessed against him personally, and without good ground or support, alleged in papers filed in the Appeals Court that a Superior Court judge who had sanctioned him had been improperly influenced and was biased. Count three arose from the respondent's representation of Maria Malave and alleged that the respondent settled a case without her authority, continued to represent her when their interests were in

2

conflict, disclosed client communications, and made misrepresentations to a court and to bar counsel.

The respondent, who has and continues to represent himself throughout these proceedings, filed an answer on March 7, 2001. Following six days of hearings, the hearing committee, on February 21, 2003, entered its report, finding that the respondent had violated numerous disciplinary rules and recommending that he be disbarred. A copy of the hearing committee's report is appended hereto as Attachment A and is incorporated herein by reference. Following a hearing before a panel of the board (panel), the panel, in a report dated December 2, 2003, adopted the hearing committee's findings in their entirety, concluded that the respondent had violated numerous disciplinary rules, and recommended that the respondent be disbarred.

In re: Matthew Cobb, BD 2004-0023, slip op. at 1-2 (Aug. 2, 2004).

After reviewing the substantial record and considering the arguments of the parties, the Single Justice concluded that Cobb should be sanctioned and that the appropriate sanction is disbarment. Id. at 1, 23.

Certain facts relating to the Nutile matter have relevance for the motion to dismiss. The Superior Court judge who imposed the first sanctions at issue in the Nutile matter was Martha Sosman, who is now a Justice of the SJC. The sanctions were imposed because of Cobb's conduct concerning his opposing counsel in the Nutile matter, Alan Rose, Esq., who was then a partner in the law firm of Nutter, McLennan and Fish. Cobb criticized then-Judge Sosman for allegedly permitting and condoning unethical conduct by Rose and another member of his firm, who was representing Rose. Rose was a witness in the BBO proceedings. A subpoena for Judge Sosman was

quashed. Before the BBO decided the Cobb matter, Rose was appointed by the SJC as a member of the Board. There is, however, no evidence, or even argument, that Rose participated in the Cobb matter after his appointment. Nor was there a request to this court for discovery on that issue.


III. THE APPLICABLE LAW

"Underlying our federal system is a presumption that the state courts are as capable as their federal counterparts of guaranteeing federal rights." Bettencourt v. Bd. of Registration in Med., 904 F.2d 772, 776 (1st Cir. 1990). "One of the many ways federal courts demonstrate comity is by refusing to grant relief whenever doing so would interfere substantially with ongoing state judicial proceedings." Id. at 777.

Younger deference is generally required to "ongoing . . . 'civil' or even 'administrative' proceedings that satisfy three conditions: (1) the proceedings are judicial (as opposed to legislative) in nature; (2) they implicate important state interests; and (3) they provide an adequate opportunity to raise federal constitutional challenges." Id. As Cobb recognizes, state bar disciplinary proceedings, such as the BBO proceedings in his case, satisfy the first two prongs of the Younger test. See Middlesex Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 432-35 (1982).

4

Cobb contends, however, that the ongoing state judicial proceedings do not offer him an adequate opportunity to raise federal constitutional challenges. He also relies on the principle that, even where all three requirements of <u>Younger</u> are satisfied, "a federal court may nonetheless intervene to halt an ongoing state judicial proceeding if the plaintiff demonstrates 'bad faith, harassment, or any other unusual circumstances.'" <u>Brooks v. New Hampshire Supreme Court</u>, 80 F.3d 633, 639 (1st Cir. 1996) (quoting <u>Younger</u>, 401 U.S. at 54).

"These exceptions to <u>Younger</u>'s policy of abstention have been very narrowly construed by the [Supreme] Court." <u>United Books, Inc. v. Conte</u>, 739 F.2d 30, 34 (1st Cir. 1984). "[T]he bias exception to the <u>Younger</u> abstention doctrine is inapposite if an ostensibly aggrieved party fails to employ available procedures for recusal of allegedly biased judges." <u>Brooks</u>, 80 F.3d at 640 (citing <u>Middlesex</u>, 457 U.S. at 435).

Moreover, "an entire group of adjudicators [such as the Justices of the SJC] cannot be disqualified wholesale solely on the basis of an alleged institutional bias . . ." <u>Id.</u> Rather, "[t]o implicate due process, claims of general institutional bias must be harnessed to a further showing, such as a potential conflict of interest or a pecuniary stake in the outcome of the litigation." <u>Id.</u> (citations omitted).

In some, but not all, circumstances, discovery and/or an

evidentiary hearing may be necessary or appropriate to decide a Younger abstention issue. In some cases, "the allegations of the complaint are clearly insufficient" to prove an exception to the Younger doctrine. See Jacobson v. Village of Northbrook, Mun. Corp., 824 F.2d 567, 570 (7th Cir. 1987). However, if the plaintiff's disputed allegations would, if proven, be sufficient to merit federal intervention, the court has the discretion to allow discovery, and to take testimony at a hearing on a motion for a preliminary injunction and/or a motion to dismiss on Younger grounds. See Kenneally v. Lungren, 967 F.2d 329, 334-35 (9th Cir. 1992); Maymo-Melendez v. Alvarez-Ramirez, 364 F.3d 27, 31 (1st Cir. 2004). A plaintiff has a duty to "demonstrate how discovery would [] permit[] him to resist Younger abstention." Medipour v. Snowden, 162 F.3d 1173 *1-2 (10th Cir. 1998) (table).

IV. ANALYSIS

As indicated earlier, Cobb asserts that the ongoing state judicial proceedings do not provide him an adequate opportunity to raise federal constitutional challenges and, therefore, that the third prong of the Younger test is not met. This contention is incorrect.

Cobb has had an opportunity to present his federal constitutional claims to the Single Justice, where they were to be considered in accordance with the general procedures of Mass. S.J.C. Rule 2:21, pertaining to actions before the Single Justice,

and reviewed under the standards of Rule 4:01, §8(4).[1] The Single Justice's decision may be appealed to the full SJC. See Mass. G. L. c. 231, §114; In re Foley, 439 Mass. 324, 333 (2003) (describing procedural step from BBO disposition to full SJC and setting forth standard of review by the full SJC).

When addressing issues arising from the actions of the Board of Registration in Medicine, the First Circuit has held that:

> [T]he review proceedings before the SJC provide an adequate opportunity to raise federal constitutional challenges. See Dayton Schools, 477 U.S. at 629 ("[I]t is sufficient under Middlesex that constitutional claims may be raised in state-court judicial review of the administrative proceeding."). The SJC reviews the Board's decisions in part for constitutional error, see Mass. Gen. L. ch. 30A, §14(7), and is permitted to gather evidence "in cases of alleged irregularities in procedure before the agency [when those irregularities are] not shown in the record." Mass. Gen. L. ch. 30A, § 14(5).

Bettencourt, 904 F.2d at 778. As explained in Johnson v. Board of Bar Overseers, 324 F. Supp. 2d 276, 283-84 (D. Mass. 2004), this conclusion is equally applicable to the judicial review of BBO decisions. More specifically, "Massachusetts law expressly guarantees to any aggrieved party the right of judicial review of administrative decisions, with the reviewing court having the power, inter alia, to modify them or to set them aside if they are issued: (a) In violation of constitutional provisions. . . . Mass.

---

[1] Rule 4:01, §8(4) provides that "[t]he subsidiary facts found by the [BBO] and contained in its report filed with the information shall be upheld if supported by substantial evidence, upon consideration of that record, or such portions as may be cited by the parties."

Gen. L. ch. 30A, §14(7)." Id. Therefore, since Cobb has "an opportunity to raise [his] constitutional claims in the courts of the Commonwealth, the third and final requirement of Younger is met." Id. at 284.

Accordingly, as explained earlier, in order to defeat the motion to dismiss and persuade this court to intervene to halt the ongoing SJC proceedings Cobb must "demonstrate 'bad faith, harassment, or any other unusual circumstance'" justifying such relief. Brooks, 80 F.3d at 639 (quoting Younger, 401 U.S. at 54). Cobb's claims are difficult to discern clearly from his May 3, 2004 Verified First Amended Complaint[2] and April 30, 2004, 77-page Verified Brief. They were clarified at the August 27, 2004 hearing.

As confirmed at the August 27, 2004 hearing, Cobb does not contend that the state court proceedings are inadequate to decide his federal constitutional claims because his case involves criticism of now-Justice Sosman, who will participate in the

---

[2]Cobb's renewed motion for a preliminary injunction was not fully briefed by him until August 26, 2004. The August 27, 2004 hearing was scheduled to permit the court to decide the defendants' motion to dismiss and Cobb's motion for preliminary injunction before the Single Justice's order requiring Cobb's disbarment became final on August 1, 2004. At the conclusion of the hearing, the court took the motions under advisement, but told Cobb that he should, for the purpose of filing his intended appeal to the full SJC, proceed on the assumption that the motion to dismiss would be granted. See Aug. 27, 2004 Tr. at 50-51. On August 30, 2004, at 4:35 p.m., Cobb submitted a motion for leave to file a second amended complaint. For the reasons being described in a separate Memorandum and Order, that motion is being denied.

decision of his case. The Verified First Amended complaint does not allege this. Nor does Cobb make this claim in the Verified Brief. Cobb stated at the August 27, 2004 hearing: "I don't see where I've got judicial bias . . . I don't think any particular justice is named, your Honor. I don't believe that's the case in the Verified Complaint." Aug. 27, 2004 Tr. at 18. In any event, as explained earlier, if Cobb were contending that the <u>Younger</u> abstention doctrine is inapplicable because of Justice Sosman's potential participation in deciding his case, he would not be entitled to relief because he has not moved for her recusal. See <u>Middlesex</u>, 457 U.S. at 435; <u>Brooks</u>, 80 F.3d at 640.

As also clarified at the August 27, 2004 hearing, Cobb does not allege that the other Justices of the SJC will not fairly decide his federal constitutional challenges because he has criticized one of their colleagues. Such a claim is not alleged in the Verified First Amended Complaint. In his Verified Brief, Cobb states that: "[he] is not here to cast any disrepute whatsoever on the SJC itself" (at 4); and he does "not[] suggest that the ex-judge, present Justice's presence . . . on the SJC constitutes any absolute bar to that court hearing the matter of Cobb's discipline for saying she was biased and potentially influenced simply as judges [sic] by her actions" (at 20). Moreover, as described earlier, Cobb stated at the August 27, 2004 hearing that, "I don't see where I've got judicial bias." Aug. 27, 2004 Tr. at 18; <u>see</u>

also id. at 21.

The Verified First Amended Complaint also does not allege that Cobb's federal constitutional claims will not be adequately heard or fairly decided by the SJC because it appointed Rose to the BBO while it was considering the case against Cobb. Indeed, Rose is not mentioned in the Verified First Amended Complaint. Cobb does argue in his Verified Brief, at 22-23, that Rose's appointment to the BBO is the "worst of the specific bias, indeed a rank appearance of unfairness," which sent a signal to the BBO that it should sanction Cobb for his claim of unethical conduct by Rose. See also Aug. 27, 2004 Tr. at 23-4. However, when asked whether he felt that the SJC has a conflict of interest Cobb responded, "I don't know if I'm going to characterize [the Rose matter] as a 'conflict of interest.'" Id. at 30. Nevertheless, although not pled in the First Amended Complaint,[3] the court has considered the contention that Younger abstention is unwarranted because Rose's appointment to the BBO demonstrates that the Board was biased, and the SJC is biased, against Cobb.

Cobb has not requested any discovery or an evidentiary hearing on this issue. As indicated earlier, there is no evidence, or argument, that Rose participated in the BBO's consideration of Cobb's case. Nor is there any evidence that any member of the BBO

---

[3]Evidently educated by the Court's questions at the August 27, 2004 hearing, Cobb included allegations concerning Rose's appointment in his proposed Second Amended Complaint.

was influenced by Rose's appointment.

Most significantly with regard to any alleged bias of the BBO, the BBO proceedings were completed when Cobb commenced this federal case. Therefore, the question before the court is not whether the BBO was biased, but whether the Single Justice and/or the SJC are biased and, therefore, unable to provide Cobb an adequate opportunity for the fair resolution of his claim that the BBO denied him his federal constitutional right to due process. Compare, Gibson v. Berryhill, 411 U.S. 564, 579 (1973) (enjoining ongoing Board of Optometry proceedings because board members with "substantial pecuniary interest in legal proceedings should not adjudicate these disputes."), with Bettencourt, 904 F.2d at 780 (dismissing pursuant to Younger because: "Here, unlike in Gibson, plaintiff waited until after the Board had rendered its decision, and after his review petition to the SJC had been filed before he brought this federal action. Plaintiff's case is for the alleged past denial of due process . . ., a claim which the SJC, having jurisdiction, is equally competent to entertain.").

As explained earlier, if Cobb wished to rely on the claim that the Younger doctrine should not be applied to his case because Rose's appointment to the BBO indicates that the Single Justice is biased against Cobb, he had a duty "to employ available procedures for recusal of allegedly biased judges." Brooks, 80 F.3d at 639. Procedures for obtaining the recusal of an SJC Justice exist under

11

Massachusetts law.  See S.J.C. Rule 3:09, Canon 3E(1). Cobb did not attempt to obtain the Single Justice's recusal, and this alone is fatal to his attempt to avoid the Younger doctrine because of any purported bias of the Single Justice. See Middlesex, 457 U.S. at 435; Brooks, 80 F.3d at 639.

Moreover, just as Cobb did not allege in his Verified First Amended Complaint that Rose's appointment to the BBO rendered the state proceedings inadequate to decide his federal constitutional claims, it appears that Cobb's appeal to the Single Justice did not allege that Rose's appointment to the Board deprived Cobb of due process.  There is no mention of any such contention in the Single Justice's August 2, 2004 Memorandum and Order.  The court understands that there is no requirement that state remedies be exhausted before a federal court intervenes pursuant to a Younger exception.  However, it would be particularly inappropriate for this federal court to grant the extraordinary relief of enjoining ongoing state court proceedings because of the state court's purported inability to decide fairly a federal constitutional claim that it appears Cobb did not even present to the Single Justice when he had an opportunity to do so.

Cobb's failure to present the issue of Rose's appointment to the Single Justice may prevent him from relying upon this claim in his appeal to the full SJC. See Cariglia v. Bar Counsel, 442 Mass. 372, at *2 (2004); In re Foley, 439 Mass. at 333. Nevertheless,

this court may consider the implication of Rose's appointment in deciding whether Cobb has demonstrated that an exception to _Younger_ abstention is justified in this case.

If Cobb appeals to the full SJC, he can move for the recusal of Justice Sosman and any other Justice he feels should be disqualified. _See_ S.J.C. Rule 3:09, Canon 3E(1). Cobb's complaint about the Rose appointment, however, arguably involves whether the impartiality of the full SJC has been compromised. If appropriate, it may be possible for every member of the SJC to recuse himself or herself and for the SJC to appoint other judges or retired Justices to hear Cobb's appeal from the Single Justice. However, for present purposes the court assumes this will not occur. _Cf._ _Commonwealth v. Loretta_, 386 Mass. 794, 796 (1982).

As described earlier, for the purposes of _Younger_ abstention analysis, "an entire group of adjudicators cannot be disqualified [for partiality] wholesale solely on the basis of an alleged institutional bias. . . . To implicate due process, claims of general institutional bias must be harnessed to a further showing, _see_ _Gibson_, 411 U.S. at 579, such as a potential conflict of interest, _see_, _e.g._, _Ward v. Village of Monroeville_, 409 U.S. 57, 60 (1972), or a pecuniary stake in the outcome of the litigation, _see_, _e.g._, _Bettencourt_, 904 F.2d at 780 n.10." _Brooks_, 80 F.3d at 640. In contrast to _Gibson_, 411 U.S. at 579, and _Ward_, 409 U.S. at 60, the Justices of the SJC have no pecuniary interest in the

outcome of Cobb's case. This alone may mean that Cobb has failed to satisfy his burden of proving that the <u>Younger</u> doctrine should not apply. The First Circuit has written:

> Without deciding the issue, we note that it is questionable whether plaintiff's allegations of bias rise to the level of a federal constitutional violation. In <u>Gibson</u>, the Court rested its holding of unconstitutional bias on the fact that the administrative board members all possessed a "substantial pecuniary interest" in the outcome of proceedings in which they served as adjudicators. <u>Gibson</u>, 411 U.S. at 579, 93 S.Ct. at 1698. Here, plaintiff makes no such allegation of a manifest conflict of interest. <u>Cf.</u> <u>Hammond v. Baldwin</u>, 866 F.2d 172, 177 (6th Cir.1989) (because plaintiffs "have alleged no personal pecuniary interest on the part of any particular officials who were to preside over their claims ..., Gibson simply is inapposite").

<u>Bettencourt</u>, 904 F.2d at 780 n.10.

Even assuming that something other than a pecuniary interest could suffice to establish a conflict of interest that would justify an exception to the <u>Younger</u> abstention doctrine, such a conflict of interest has not been demonstrated here. As described earlier, when asked by the court, Cobb did not charge that Rose's appointment to the BBO created a "conflict of interest" for the SJC. Rather, he candidly and commendably stated: "[T]he Rose thing. I don't know if I am going to characterize that as a 'conflict of interest.' I think it is something that should not have occurred." Aug. 27, 2004 Tr. at 30.

In any event, this court finds that the SJC's participation in the Rose appointment and any related issues do not render the SJC an inadequate forum for fairly deciding Cobb's federal

14

constitutional claims. Nor is the Rose appointment evidence that the Justices of the SJC have prejudged the merits of Cobb's case or that they harbor animosity against Cobb sufficient to overcome the presumption that they are "'men [and women] of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.'" Withrow v. Larkin, 421 U.S. 35, 55 (1974), quoting United States v. Morgan, 313 U.S. 409, 421 (1941); see also Brooks, 80 F.3d at 640.

The fact that Cobb has failed to make the showing necessary to establish an institutional (or "structural") bias exception to the Younger abstention doctrine is also fatal to the primary, if not sole, claim alleged in the Verified First Amended Complaint, and argued in the Verified Memorandum and at the August 27, 2004 hearing -- what Cobb characterizes as his "structural claim." See Brooks, 80 F.3d at 640 and n.9.

Cobb's structural argument has three components. First, he contends that in 99% of the cases in which disciplinary proceedings are initiated by the BBO, sanctions are imposed and, if appealed, upheld by the SJC. See, e.g., Aug. 27, 2004 Tr. at 25. Second, he asserts that he did not receive the fair notice necessary to afford him due process with regard to the charge that he illegally converted the Nutiles' money to his own use. Id., citing In the Matter of Ruffalo, 390 U.S. 544 (1968). Third, Cobb complains that the "stacking" of charges against him was unfair because, while he

received clear notice of the three charges, he was not informed that he would be sanctioned more severely if all three were proven and deemed to be a "pattern" of misconduct. Id. at 25-26. Cobb contends that these three, alleged facts, as well as undue "preindictment delay" in bringing the charges, caused the BBO to deprive him of due process.

With regard to Cobb's claim that the BBO violated his federal constitutional rights, because he has failed to make the showing necessary to demonstrate an institutional bias of the SJC, this case is comparable to Bettencourt, in which the First Circuit wrote, "[p]laintiff's case is for the alleged denial of due process . . ., a claim in which the SJC, having jurisdiction, is equally competent to entertain." Bettencourt, 904 F.2d at 780.

Cobb implicitly seeks to distinguish Bettencourt's finding that the SJC is competent to decide a due process claim by contending that the purported 99% rate at which BBO disciplinary hearings result in sanctions demonstrates that the defenses of Cobb and other attorneys are not fairly considered by the BBO or the SJC. Thus, he claims that a federal forum is necessary to afford him due process.

The sole discovery that Cobb requested at the August 27, 2004 hearing is a "Bar Counsel's Statistical Report," which Cobb claims would confirm that his calculation of a 99% sanction rate is correct. See Aug. 27, 2004 Tr. at 32, 35. This document, which had

16

not been previously described or requested by Cobb, and was not known to defendant's counsel, id. at 35, is not material to the merits of the pending motions.  Therefore, the production of it is not necessary to the resolution of Cobb's claim.

The court recognizes that in Bettencourt, 904 F.2d at 778, the First Circuit found that the SJC had in the past overturned the Board of Registration in Medicine's decisions on due process grounds. The record does not permit a comparable finding in this case.

However, even assuming, without finding, that 99% of BBO proceedings result in sanctions, this fact alone would not be sufficient to prove that the state bar disciplinary process is fundamentally unfair. In fiscal year 2000, the most recent year for which national statistics seem to be available, 91.5% of all felony defendants in federal courts were convicted, either on guilty pleas or after trials. See 2002 Sourcebook of Criminal Justice Statistics, at 416 (Kathleen Maguire & Ann L. Pastore eds. 2003). This high conviction rate does not mean that the administration of federal criminal justice is fundamentally unfair. Rather, it indicates that generally only guilty people are being prosecuted. Similarly, an even higher rate of "convictions" in BBO disciplinary proceedings is consistent with the conclusion that the Board is prosecuting only the strongest possible cases.

In the context of the death penalty jurisprudence that Cobb

inaptly cites, the Supreme Court has said with regard to statistics that "where the discretion that is fundamental to our criminal process is involved, [courts should] decline to assume that what is unexplained is invidious." McCleskey v. Kemp, 481 U.S. 279, 312-313 (1987). Similarly, the mere existence of a very high rate of BBO proceedings resulting in sanction is, alone, not enough to prove that state court review of BBO decisions generally denies attorneys their federal constitutional right to due process.

The second element of Cobb's "structural" claim is that after the close of the evidence, the BBO changed its theory concerning his alleged conversion of the Nutiles' money to pay sanctions imposed on Cobb, rather than on his clients. He asserts that this change deprived him of his right to fair notice, which is an essential element of his right to due process as it was amplified in Ruffalo, supra. For the reasons described previously, the SJC is an adequate forum for the fair resolution of this federal constitutional claim. Thus, it is not appropriate for this court to address the merits of that claim. See Bettencourt, 904 F.2d at 780.

Similarly, the SJC provides Cobb an adequate opportunity to litigate his claim that the BBO did not give him constitutionally adequate notice that he would be more severely sanctioned if the three charges against him were proven and deemed to be part of a pattern of misconduct. Id. Therefore, this court need, and should, not address the merits of this claim. However, it notes that

18

punishing multiple ethical violations more severely than single instances of attorney misconduct has long been a practice of the BBO that has been upheld by the SJC. For example, the SJC wrote in 1989:

> The respondent also argues that the imposition of a suspension on the basis of the cumulative effect of, as he has characterized them, "little tiny matters," is a "radical departure" from other disciplinary cases. The simultaneous consideration of separate violations, however, is an established part of the disciplinary system of this Commonwealth. For example, in Matter of Sondej, 2 Mass. Att'y Discipline Rep. 191 (1981), the single justice considered simultaneously two informations encompassing seven separate counts of misconduct. In arriving at an appropriate disciplinary sanction for the respondent in that case (a four-year suspension), the single justice considered the several violations together to arrive at his judgment. See Matter of Herman, S.J.C. No. 87-24 BD (Nov. 30, 1987) (public censure warranted by several unrelated violations of the Canons); Matter of Gillis, S.J.C. No. 86-39 BD (June 3, 1987) (six-month suspension imposed on the basis of five separate incidents considered cumulatively); Matter of Collins, 1 Mass. Att'y Discipline Rep. 63 (1979) (public censure imposed on the basis of three separate instances of minor misconduct); Matter of Ravanis, 1 Mass. Att'y Discipline Rep. 249 (1977) (two-year suspension imposed on the basis of three separate violations). We conclude that consideration of the cumulative effect of several violations is proper.

In the Matter of Saab, 406 Mass. 315, 326 (1989); see also In the Matter of Garabedian, 415 Mass. 77, 84 (1993).

Finally, Cobb ardently and repeatedly argues that the evidence before the BBO was plainly insufficient to prove that he converted the Nutiles' funds to pay sanctions imposed on him alone. He contends that a finding by the BBO so contrary to the evidence, which has been upheld by the Single Justice, demonstrates that he

has not received, and cannot receive, due process in the state system. However, as the Supreme Court has written with regard to the federal recusal statute, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." Liteky v. United States, 510 U.S. 540, 555 (1994). As explained earlier, state law generally provides attorneys an adequate opportunity to present their federal claims in the state judicial proceedings, and Cobb has not demonstrated that the SJC has a conflict of interest or bias in this case that will deprive him of the opportunity to have his federal constitutional claims fairly decided by the SJC. As defendants are entitled to have this case dismissed pursuant to Younger, this court is not evaluating the merits of Cobb's claim that the evidence was clearly insufficient to prove conversion.

The court notes, however, that if and when Cobb is finally disbarred by the courts of the Commonwealth, he will have an opportunity to litigate his due process and sufficiency of the evidence claims in federal court for a limited purpose. Rule 83.6(2)(B) of the Local Rules for the United States District Court for the District of Massachusetts provides that if the District Court receives a certified copy of a judgment of disbarment by the state courts, Cobb will be given an opportunity to show cause why he should not be disbarred as a member of the bar of the District Court as well. If Cobb elects to challenge his disbarment by the District Court, he will have an opportunity to attempt to prove,

20

among other things, that it clearly appears that the state disciplinary proceedings and/or judicial process deprived him of his right to due process or that there was such an infirmity of proof that the District Court should not rely upon the conclusions reached in those proceedings. <u>See</u> Local Rule 83.6(2)(D).


V.    ORDER

In view of the foregoing, it is hereby ORDERED that:

1.    Defendants' Motion to Dismiss (Docket No. 3) is ALLOWED.

2.    Cobb's Renewed Motion for a Preliminary Injunction (Docket No. 11) is MOOT.


                          /s/ Mark L. Wolf
                    UNITED STATES DISTRICT JUDGE